Filed 11/5/13  In re V.L. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re V.L. et al., Persons Coming Under the Juvenile Court Law. | B248361 |
| | (Los Angeles County Super. Ct. No. CK83501) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER L.,<br><br>Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna Levin, Juvenile Court Referee.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel for Plaintiff and Respondent.

_____

Christopher L.'s parental rights with respect to three of his children were terminated pursuant to section 366.26 of the Welfare and Institutions Code.[1] Christopher L. claims on appeal that the juvenile court erred in failing to apply the parent-child relationship exception to the statutory preference for adoption. He further argues that there was insufficient evidence of unfitness to permit termination of parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Three year-old V.L. and one year-old Aaden L. came to the attention of the Department of Children and Family Services (DCFS) in July 2010 when reports were made of domestic violence by their father, Christopher L., against them and against their mother, Paola G.

Upon investigation, DCFS found that the children bore no physical signs of abuse but that V.L. was very aggressive, hitting her brother and the social worker. Paola G. told DCFS that Christopher L. was violent with her and physical with the children. She said that in the incident that prompted the referral, they had an argument and that he had shoved her. Paola G. saw this as nothing out of the ordinary: she was accustomed to violence in the home and thought that Christopher L. was justified in being angry because he was tired and she would not stop arguing with him. She had lied to the police when they came to the home to investigate the violence. Christopher L. had previously been arrested for inflicting corporal injury on a spouse or cohabitant; he was convicted of a lesser charge. Christopher L. told DCFS that he had just completed a court-ordered 52-week domestic violence class.

During the initial interview, Paola G. disclosed to DCFS that she periodically used methamphetamine. She underwent drug testing, and the results revealed levels of methamphetamines that were indicative of a chronic heavy user who had probably used methamphetamines the same day she tested.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

DCFS detained the children and filed a petition under section 300, subdivisions (a) and (b) alleging that the children fell within the jurisdiction of the juvenile court due to domestic violence, Paola G.'s drug use, and Christopher L.'s failure to protect them from their mother's drug use.

Shortly after the children were removed from her custody, Paola G. enrolled in a residential substance abuse program. Christopher L.'s visitation began first; during the first documented visit, he demonstrated minimal interaction with the children. As of September 2010, he had not expressed interest in raising the children on his own, nor had he demonstrated the ability to do so.

In September 2010 Paola G. pleaded no contest to the dependency petition. The court dismissed the section 300, subdivision (a) and (b) allegations concerning domestic violence and declared the children dependents of the juvenile court under section 300, subdivision (b) based on the sustained allegation concerning Paola G.'s drug use and Christopher L.'s failure to protect the children from the effects of her substance abuse. The court further found by clear and convincing evidence that substantial danger existed to the physical health of the children and/or that the children were suffering severe emotional damage, and that there was no reasonable means to protect them without removal. Paola G. was ordered to undergo drug rehabilitation; Christopher L. was ordered to attend individual counseling to address anger management and family dysfunction.

As of March 2011, Paola G. was on her third drug treatment program since the children were detained. She left the first program in September 2010 because she did not like being away from her children and Christopher L. She participated sporadically in the second program from September to November 2010; she was reportedly "unable to embrace the program and [wa]s unable to follow directions [from] counselors." She had relapsed in November 2010 and used methamphetamines; she blamed this upon the stress of the dependency case. Paola G. was also pregnant. She had begun having visits with the children that were appeared "positive for both Ms. G[.] and her children."

3

Christopher L. had not had regular visitation with his children. Between November 2010 and March 2011 he had visited the children only twice. He attributed this to his busy work schedule. The caregiver was willing to schedule visits for weekend days, but Christopher L. needed to contact her. When Christopher L. did visit with the children, DCFS observed that he "was more observing the children than interacting with [them]. The father sat in the corner of the room by himself and the only [time] he interacted with the children [was] when he handed the younger child Aaden [L.] a toy that the child dropped at the father's feet." The children's caregiver reported that Christopher L. rarely interacted with the children beyond playing with V.L. for 10 minutes.

Christopher L. had attended two of three scheduled therapy appointments. He was, DCFS reported, "very withdrawn," but admitted he found it difficult to have two children. He said he loved his children and was working hard to provide for their financial needs. He acknowledged needing to learn better parenting skills and to control his temper; he believed that therapy was helping him.

V.L. had been in regular play therapy designed to address symptoms of post-traumatic stress disorder, to assist her with separation from her mother, and to assist her in reducing trauma-related anxiety. V.L. was described as proactive and highly compliant; she was doing well in therapy and at home, with no behavioral concerns. Aaden L. had been throwing daily tantrums that were so severe that he would throw himself on the floor and try to bang his head; DCFS was working to coordinate therapeutic services for him. The severity of the tantrums had been decreasing in recent weeks.

At the March 2011 review hearing, the court found that the children could not be returned to their parents without a substantial risk of detriment to their physical and/or emotional well-being. The court continued reunification services for both parents. Between March 12, 2011, and May 2, 2011, Christopher L. visited the children only twice. His visits were liberalized to unmonitored in May 2011, and he began visiting the children regularly on Saturdays and Sundays until late August 2011.

Allyson L. was born in April 2011. Initially she was with her parents, but in August 2011 she was detained and a dependency petition filed after Paola G. tested positive for methamphetamine and amphetamine. Paola G. had been discharged from another drug treatment program in June due to nonattendance; she had enrolled in another program in July, but she had missed more than half of the days since she enrolled. Christopher L. claimed not to know that Paola G. was using drugs again. DCFS asked Christopher L. on August 22, 2011, if he wanted Allyson L. released to him. He did not answer; when pressed, he said, "What do you want me to say?"

DCFS had become concerned that Christopher L. might have a developmental or mental health issue, or might be using substances himself. His therapist had asked that he be evaluated. At times, Christopher L. mumbled and appeared unable to understand information. On one occasion, the social worker went to his home for a scheduled visit, found him asleep in bed, and was unable to rouse him. He was asked to submit to a drug test but did not take the test. Another social worker tried to communicate with him in Spanish when communications were difficult; he said English was fine, but she could not understand him.

Once Paola G.'s visitation became monitored once again in late August 2011, father stopped making efforts to see his children. The social worker told Christopher L. that she was concerned that he had not visited the children on past weekends, nor did he seem interested in visits unless Paola G. would be there. He just shook his head.

As of September 2011, Christopher L. had attended therapy regularly. He had made "progress in reaching goals" with a first therapist, but his new therapist was having trouble establishing a relationship because of Christopher L.'s limited communication skills.

The court ordered DCFS to assess Christopher L.'s living arrangement and possible release of Allyson L. to him; when Paola G. moved out of Christopher L.'s home, DCFS began working to place Allyson L. with him. On August 25, 2011, DCFS again asked Christopher L. if he was interested in having Allyson L. released to him. He revealed that Paola G. had told him to "get" Allyson L., and the social worker explained

5

that he could not have her until it could be assessed that he could care for her. The social worker asked if he wanted to care for the children if they could not be returned to Paola G.; he asked if he could wait until court to answer that question. When pressed, Christopher L. said he wanted to talk to his mother. He did so, and reported that his mother had told him to "get his kids." The social worker asked him whether he had come to meet with her because his mother and Paola G. wanted him to get custody of the children, or because he personally wanted the children back in his care. Christopher L. did not answer. The social worker observed that he could not seem to confirm whether he wanted the children in his life and that he seemed dependent on how Paola G. and his mother felt.

Christopher L. did not appear for a meeting scheduled to create a safety plan for Allyson L., and he failed to make himself available to be interviewed for the jurisdictional/dispositional report concerning Allyson L. The social worker reported to the court, "The father's lack of cooperation with the Department makes it appear that the father is not prepared to commit to caring for his child Allyson [L.] and therefore, the Department has not been able to release Allyson [L.] to the father's care." (CT 614)

On September 16, 2011, the court sustained an allegation in the dependency petition relating to Paola G.'s conduct and declared Allyson L. a dependent child under section 300, subdivision (b). According to the minute order, Christopher L. was noted to be "non-offending."

As of October 2011, DCFS advised the court that Christopher L. was attending individual counseling as ordered. The therapist, however, had not provided any assessment of Christopher L.'s progress, and Christopher L. had not taken the required steps for an assessment letter to be prepared. DCFS had again asked Christopher L. whether he wanted the children to be returned to his care. "Mr. L[.] continued to evade answering [the social worker's] question and suggested that [the] children be allowed to go with mother if she is accepted into a drug treatment program. [The social worker] asked the father what was preventing him from wanting the children returned to his care and clarified to the father that the [D]epartment would assist him with childcare so he

6

could continue to work. [The social worker] reminded Mr. L[.] that he is the children's father and they love him and it is always the [D]epartment['s] goal for the children to be reunified with biological parents when possible. The father started [to] tear up but again he did not give [] a verbal response. As of the writing of this report the father has not contacted the [D]epartment stating that it is his desire for the children to be return[ed] to his care."

Christopher L. began visiting the children when Paola G. was not present. Visits were reported to be going well, but it also was reported that Christopher L. would pick up the children but then leave them in the care of relatives who had not been cleared by DCFS. He did not stay for the entire visit with his children, and he also canceled a number of Saturday visits. DCFS was concerned about Christopher L.'s conduct because it indicated unwillingness or inability to care for the children, but it was unable to determine what was happening on the visits because Christopher L. was not in contact with DCFS. DCFS was also concerned by a report that Paola G. had shown up during the children's visits with their father, despite a court order that she not be present during visits. Efforts to clarify what had occurred were unavailing because Christopher L. did not return DCFS's phone calls. Christopher L. also refused to return calls from other service providers attempting to reach out to him.

Paola G. continued to engage in illegal drug use, and DCFS expressed concern that Christopher L. "continues to demonstrate that he is unable to protect his children due to his inability to assess if the mother is under the influence of drugs. A clear example of that is when the father allowed the mother to be the sole caretaker for their four month[-]old child Allyson [L.] when the father knew or reasonably should have known of the mother's relapse because he has been around her before when she has been under the influence of drugs. The father's failure to protect [] all of the children from the mother endangers the children's physical and emotional health and safety and places the children at risk . . . ." DCFS recommended the termination of reunification services and the pursuit of adoption as a permanent plan for the children.

On October 21, 2011, the court found that Christopher L. was in partial compliance with the case plan. It terminated reunification services for both parents with respect to the older two children; Christopher L. was given six months of reunification services with Allyson L. Christopher L. was ordered to take a parenting education course, to attend Al-Anon meetings, and to undergo individual counseling.

As of January 2012, Christopher L. was not confirming his visits and had to be reminded of his visits. He had canceled some visits so late that the foster caregiver was already on her way to the visitation location with the children. The caregiver was concerned about the care that Christopher L. was providing. Although she packed the children's bag with food, cereal, and diapers, all items were still in the bag when the children returned from their visits. The younger two children returned home from each four- or five-hour visit with wet and dirty diapers. Although the caregiver had raised this issue with Christopher L., he continued to return the children in the same condition. DCFS sought in February 2012 to change the visitation to monitored visitation because it believed that Christopher L. was permitting Paola G. to see the children unsupervised. The court permitted the visits to remain unsupervised but ordered Christopher L. not to take the children to the mother during visits.

As of April 2012, Christopher L. was in therapy with a new counselor. In January and February 2012 he had attended seven of eight scheduled sessions, but arrived late five times. The therapist was having difficulty communicating with Christopher L. due to his poor communication skills, and she believed that he would benefit from a developmental assessment. He had told the therapist that he was attending a parenting education class. When the social worker asked Christopher L. for the name of the class, he disclosed that he had not attended any such class and that he lied to the therapist. He had also not attended any Al-Anon meetings.

May 2012 reports from Christopher L.'s therapist indicated that he was attending sessions regularly and arriving on time. The therapist stated that he was improving at communication and that they were "working on communication skills and researching parenting classes." The therapist could not say that Christopher L. had ever clearly

8

communicated a desire to have his children returned to him. He had still not demonstrated that he had enrolled in parenting classes or attended any Al-Anon meetings. DCFS reported that Christopher L. continued to be uncooperative: "Since the inception of the case with V[.L.] and Aaden L[.] the father would not really communicate when meeting with the [D]epartment which has made it difficult for [the social worker] to assess if []he understands the seriousness of the situation and if he had any insight into the case issues which brought the family to the [D]epartment's attention. At times the father appears to be willing to open up more regarding case issues and demonstrate a desire to do the work necessary to have his children returned to his care full time, however he fails to follow through. For example, the father currently has family reunification services with . . . Allyson L[.] and the father [has] only met with [the social worker] three times since October 2011 with the last time being February 2012 to discuss the issues surrounding this child." Moreover, Christopher L. waited 11 days after the children's placement was changed to inquire about the placement and visitation.

Visitation in the children's new placement was difficult. The new caregiver reported that Christopher L. was frequently late in picking up or dropping off the children. Christopher L. did not leave his home to go to the arranged meeting place until the caregiver was already there and telephoned him, requiring the children to wait there for him. Christopher L. continued to leave the children with his parents (one of whom had not been cleared by DCFS) for hours at a time. Christopher L. ignored repeated requests from the caregiver not to feed the children candy and sweets due to dental issues. Aaden L. came back from one visit sick to his stomach from drinking two frozen drinks and vomited.

DCFS continued to be concerned that Christopher L. had not taken steps to learn to recognize the signs of drug use, how to build a support system, or how to build boundaries with an addict. He still had not taken the parenting class he had lied to say he was taking. Based on conflicting reports by the parents over a long period of time, DCFS believed that the parents continued to be in a relationship and were attempting to deceive DCFS into believing that they were no longer together. Christopher L. still had never

said that he wanted his children given to him, and although the court had authorized DCFS to allow overnight visits with Allyson L., Christopher L. refused to schedule a meeting to assess his home for those overnight visits, and he would not return DCFS's phone calls to discuss case plan goals. DCFS feared that if the children were returned to Christopher L.'s care that he would allow Paola G. to have unmonitored access to the children and that he would still not be able to tell if she had again relapsed. Based on "the father's continued relationship with the mother and his apparent deception about this issue to DCFS, his non[-]participation in the court[-]ordered case plan by not attending parenting classes and Al[-A]non, and his continued lack of insight into the seriousness of the case issues which have already placed the children's safety at serious risk," DCFS recommended proceeding with the adoption of V.L. and Aaden L. These same concerns and the lack of participation and progress toward alleviating the child safety issues prompted DCFS to recommend termination of reunification services with Allyson L.

The court terminated reunification services for Christopher L. on June 7, 2012. The children were placed together in the home of prospective adoptive parents in late July and early August 2012. Although the court had ordered monthly visitation for Christopher L. with the three children at the time reunification services were discontinued, Christopher L. did not make himself available to arrange visits for the following four months, and he failed to appear for a scheduled visit in August 2012.

On March 15, 2013, the juvenile court terminated parental rights to the three children. Christopher L. appeals.

## DISCUSSION

### I. Parent-Child Exception

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. [Citation.] To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that

the minor is likely to be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) Then, in the absence of evidence that termination of parental rights would be detrimental to the child under statutorily specified exceptions (§ 366.26, subd. (c)(1)(A)-(B)), the juvenile court 'shall terminate parental rights.' (§ 366.26, subd. (c)(1).)" (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.)

Christopher L. asserts that the parent-child relationship exception to termination of parental rights was applicable here. We review the determination whether a beneficial parental relationship exists for substantial evidence and the conclusion as to whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) under the abuse of discretion standard. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622.)

"Section 366.26 provides an exception to the general legislative preference for adoption when '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' (§ 366.26, subd. (c)(1)(B)) because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.] No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

Here, although the court did not make separate findings on the two prongs of the parent-child exception to termination of parental rights, the juvenile court concluded that the evidence put before the court demonstrated that Christopher L. did not have a beneficial parental relationship with the children. The court was correct. As the juvenile court noted, Christopher L. did not make himself available to provide a home for the children. Although DCFS repeatedly attempted to explore placing the children with Christopher L., he did not actively seek to reunite with his children or take steps to effectuate reunification. While he did visit with the children, the record contains multiple observations that his visitation was inconsistent; that he did not engage with them during visits; that he left them with other caregivers during his visitation time, and that he sometimes did not meet their physical needs when he was with them. He also failed to visit regularly once the children were placed with prospective adoptive parents.

Christopher L. acknowledges that he observed the children rather than interacting with them, that concerns were raised about his conduct during visits and that he did not show up for at least one visit after the preadoptive placement, but he contends that he occupied a parental role with respect to the children. First, he notes that it was reported that at one point in the dependency proceedings he changed Allyson L.'s diapers, fed her, and kept her clean during visits. The record does indicate that on two consecutive-day visits in September 2011, Allyson L. was returned clean, with a new diaper, and appeared to have been well-fed. At other points in the dependency proceedings, however, it was reported that he left two of the three children in dirty diapers, was not feeding them the food the foster parent sent along, and fed the older children so many sweets (despite being asked not to because the children had developed dental problems) that one of them threw up after a visit. Moreover, he failed to make efforts to arrange visitation with DCFS or the foster parents unless the children's mother pushed him to do so.

Christopher L. admits that Allyson L. was too young to have developed a bond with her parents before her removal from their custody, but notes that V.L. had lived with Christopher L. for nearly four years when she was removed; Aaden L. a little more than a year, and Allyson L. four months. V.L. was three years old and Aaden one year old when

12

they were removed from their parents' custody in August 2010. As a result, V.L. spent nearly three years of her first six and one-half years of life out of her parents' custody, and Aaden L. spent nearly three of his first four years out of his parents' custody. Allyson L. spent only her first three months in the custody of her parents before being removed. Christopher L. has not established any error in the court's ruling with these facts.

Christopher L. notes that he acted as a parent by working at two jobs to provide for them financially. Christopher L.'s consistent willingness to work long hours to provide for his family was noted and described as a strength in the record, but it does not establish that he maintained regular visitation and contact with the children and that they would benefit from continuing a relationship with him. (§ 366.26, subd. (c)(1)(B)(i).)

Christopher L. also notes two instances in the record in which he expressed a desire to have one or more of his children placed with him, and he argues that these two occasions "were in direct contradiction to the social worker's comments that Father would not say whether he wanted the children returned to his care." Those two instances are documented in the record, but this record is replete with evidence that Christopher L. did not make significant efforts to maintain a relationship with his children or to get them back. He avoided contact with DCFS to the point that it impeded DCFS's ability to place Allyson L. with him, to liberalize his visitation, or to determine whether any of the concerns raised about the children's visits were warranted. He failed to comply with the case plan and lied about it. He filed a section 388 petition seeking placement of the children with his and reinstatement of family reunification services, but this was only after his history of partial compliance and lack of progress over the course of several years had led to the termination of those services.

Christopher L. next argues that by April 17, 2012, he was ready, willing, and able to be a full-time parent. Relying on his unsuccessful section 388 petition filed six months after the court had already terminated reunification services, Christopher L. asserts that he had suitable housing, stable employment, and family support, as well as a plan for the safe care of the children; and he was visiting regularly at that time. He asserts that his

13

relationship with the children was excellent, and he interacted with the children in "an appropriate, loving manner." Interacting with the children in an appropriate, loving manner and having "enjoyable" visits is not enough to establish that one occupies a parental role in the children's life. "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) The record on appeal does include Christopher L.'s attorney's April 2012 declaration asserting that Christopher L. acted in a parental role with respect to the children, but the existence of this conclusory assertion in the record does not undermine our conclusion that substantial evidence supported the juvenile court's conclusion that no parent-child bond existed.

Christopher L. correctly observes that a parent-child relationship significant enough to warrant an exception to termination of parental rights may exist even without day-to-day contact between parent and child, and he asserts that the children "also had a primary attachment to their birth parents." Christopher L. does not offer any evidence to support the conclusion that the children were attached to him; the only evidence he points to is Paola G.'s testimony about how she related to the older two children. Christopher L. has not identified evidence in the record to support his contention that the children had a primary attachment to their father, nor have we located any such evidence.

Although the court's conclusion that Christopher L. did not establish a beneficial relationship with the children was sufficient to end the inquiry, the juvenile court nonetheless considered whether the children would benefit from continuing their relationship with their parents and concluded that that it was in the best interest of the children to terminate parental rights. Christopher L. argues in a conclusory manner that termination was detrimental and that the parent-child relationship promoted their well-being to such a degree as to outweigh the benefits of adoption, but he offers no evidence or argument to support this contention. We have not identified any evidence in the record that termination of the parent-child relationship would have been detrimental to any of the children or that their relationships with their father conferred benefits to them more

14

significant than the permanency and stability offered by adoption. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [exception applies only if the severance of the parent-child relationship would "deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed"].) We cannot say that the juvenile court abused its discretion when it concluded that the benefits to the children that would arise from adoption outweighed any detrimental impact that might come from severing their relationship with their father.

## II.     Allegations of Bias

Christopher L. alleges that DCFS and the juvenile court were biased against his relationship with his children based on four concerns that he characterizes as improper: (1) he worked two jobs; (2) "he allowed and encouraged the children to have visitation with and develop a relationship with the paternal grandparents before DCFS had cleared them for visitation"; (3) he and Paola G. had an ongoing relationship; and (4) he experienced communication difficulties and possible developmental issues.

Christopher L. claims that these issues were all irrelevant to the issues at the hearing on the termination of parental rights and that "it was an abuse of discretion to consider any of the foregoing issues in the determination of whether the section 366.26, subdivision (c)(1)(B)(i), exception was applicable." Christopher L. however, has not demonstrated that the court did consider any of these allegedly improper issues at the hearing on the termination of parental rights, and the record of the hearing does not suggest that the court considered any of these subjects in making its ruling on the parent-child exception. The court's statements from the bench describing its findings do not mention any of these issues. Instead, the court noted that Christopher L. had not made himself available to provide a home for the children; that he did not visit once the children were in a preadoptive home; that his visits were monitored except for a period of time when they were unmonitored; that he did not testify concerning his bond with the children but that the reports did not demonstrate any special bond; and that the reports submitted to the court did not document any parental role with respect to the children. As

15

Christopher L. has not offered any evidence from which it could be concluded that any of these allegedly improper considerations intruded on the determination of whether the parent-child exception to termination of parental rights existed, he has not established any abuse of discretion or error here.

### III. Parental Unfitness

Christopher L. argues in his supplemental opening brief that his parental rights were improperly terminated because "the juvenile court made only a nominal finding that he was an unfit parent as to V[.L.] and Aaden [L.], the fitness finding as to Allyson [L.] applied to Mother only, and even if such a finding was made, the evidence was insufficient to support that finding as to Father."

"California's dependency scheme no longer uses the term 'parental unfitness,' and now requires that the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child." (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1211.) Here, as Christopher L. acknowledges in his reply brief, the juvenile court ordered V.L. and Aaden L. removed from their parents after finding by clear and convincing evidence that substantial danger existed to the physical health of the children and/or that the children were suffering severe emotional damage, and that there was no reasonable means to protect them without removing them from their parents' custody. In later proceedings, infant Allyson L. was ordered removed as well, again based on the juvenile court's finding by clear and convincing evidence that substantial danger existed to her physical health and/or that she was suffering severe emotional damage, and that there was no reasonable means to protect her without removing her. Although Christopher L. asserts that because he was non-offending with respect to Allyson L., "it should be presumed the substantial danger finding was as to Mother only," he offers no basis in authority or in the record upon which to base a conclusion that the removal findings pertained only to Paola G. The evidence before the court was not only that Paola G. was using drugs again, but that Christopher L., whether deliberately blind to

Paola G.'s drug use or unable to detect that she was on drugs, took no steps to protect Allyson L. from her substance-abusing mother.

Findings that returning a child to the parent's custody would create a risk of detriment to the child are a sufficient unfitness determination for purposes of later terminating parental rights. (*In re P.A.*, at pp. 1212-1213.) This is true even if the parent was not the subject of jurisdictional findings: Detriment findings, when "supported by substantial clear and convincing evidence, may provide an adequate foundation for an order terminating parental rights even in the absence of a jurisdictional finding related specifically to a parent." (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1214.) Christopher L. argues that the findings of detriment or unfitness here were not supported by substantial evidence.

We find that the findings of detriment were supported by substantial evidence. With respect to V.L. and Aaden L., the evidence was that Christopher L. engaged in domestic violence in front of the children and that he knew or reasonably should have known of Paola G.'s drug use, but failed to protect the children from their mother while she used illegal drugs. Paola G. was again using drugs when Allyson L. was an infant, but Christopher L. did not protect her from her mother. Christopher L. maintained that he did not know and could not tell when Paola G. was using drugs; without being able to discern when she was using drugs, he was unable to protect the children from her when she was using them. Christopher L. was ordered to go to Al-Anon to address these issues, but he did not attend.

Christopher L., moreover, never demonstrated the ability to take care of the children appropriately. He left the children in the care of his parents although they were not cleared to take care of them, and he returned the younger two children from visits in dirty diapers. He ignored requests to avoid feeding the children sweets and to feed the youngest age-appropriate food that the caregiver sent along for visits. He was inconsistent in visitation, and he did not make himself available to DCFS even for the purpose of setting up overnight visits with Allyson L.

Christopher L. also did not appear to be very interested in having custody of his children. He was asked repeatedly by DCFS whether he wanted them returned to his care, and he never said he wanted them back. Only twice in the juvenile court proceedings did he express a desire to have custody of his children, and both of these statements were contained in documents prepared by his attorney. Christopher L.'s conduct also reflected an absence of desire to take custody of his children. He never addressed the issues that led to the children being removed from the home. He did not attend parenting classes or Al-Anon meetings when ordered to do so; and although he did go to counseling, at no point were any of the therapists he saw able to describe any significant progress he had made toward ameliorating the issues raised by the case.

Because the juvenile court did in fact make detriment findings, and those findings were supported by substantial evidence, Christopher L. has not demonstrated any error in terminating his parental rights.

**DISPOSITION**

The judgment is affirmed.


                                                    ZELON, J.

We concur:


    PERLUSS, P. J.


    WOODS, J.


18