[No. B234948. Second Dist., Div. Seven. Feb. 15, 2012.]

In re K.P., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
KIMBERLY G. et al., Defendants and Appellants.

**COUNSEL**

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Kimberly G.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant K.P.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Emery El Habiby, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

ZELON, J.—Mother Kimberly G. and father K.P.[1] appeal the termination of their parental rights over their son K.P., contending that the juvenile court erred in failing to apply the parent-child relationship exception to the statutory preference for adoption. We find that substantial evidence supported the juvenile court's findings and that the court did not abuse its discretion in declining to apply the exception, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

K.P. was detained shortly after his November 2008 birth when drugs and firearms were found at the home where he lived. The Los Angeles County Department of Children and Family Services (DCFS) filed a petition alleging that K.P. came within the jurisdiction of the juvenile court under Welfare and Institutions Code[2] section 300, subdivision (b). The juvenile court found K.P. a dependent child on January 14, 2009.

According to reports filed by DCFS prior to the section 366.21, subdivision (e) review hearing, K.P. was in good health and was doing well in foster care. Father was incarcerated. Kimberly G. recently had enrolled in a program for substance abusers and her single drug test was negative. Her counseling sessions were on hiatus during summer vacation from school. Kimberly G. had monitored visits four times per week of two hours each. She was attending an occupational training program that conflicted with her visitation schedule, and had changed the schedule of her monitored visits to accommodate that training. Despite the change of schedule at her behest, Kimberly G. had arrived one and one-half hours late for a visit, explaining that she "had other things to do." Kimberly G. had previously arrived late for visits or cut them short.

During visits, Kimberly G. played with K.P., changed him, and fed him. She sang to him and tried to engage him with educational toys. K.P. responded by laughing, clapping his hands, and bouncing up and down in her arms. DCFS wrote, "Mother and child appear to bond well at their visit; however, mother has missed a couple of visits and has cut visits short."

In August 2009, K.P. was placed in the home of his maternal great-grandparents. As of March 2010, DCFS described the home as "a nurturing, safe and healthy environment" for him. Kimberly G. visited three times per

---

[1] Father and son have the same name. For clarity, the senior K.P. will be referred to as "Father" and the junior K.P. by his initials.

[2] All further statutory references are to the Welfare and Institutions Code.

week, for approximately four hours per visit. She fed K.P., changed him, played with him, and brought him clothes and toys during visits. K.P. was noted to be bonded with Kimberly G. He called her "Mommy," the same name he called his great-grandmother.

Kimberly G. appeared to DCFS not to be "serious about her compliance with the court orders." She had not documented her attendance at any court-ordered programs. When asked about the services she was receiving, Kimberly G. stated that she could not remember the providers and their phone numbers. She had missed nine out of 14 drug tests, and had one positive drug test result. DCFS requested that reunification services be terminated.

As of May 2010, DCFS had learned that Kimberly G. had begun a one-year outpatient chemical dependency treatment program in November 2009. She had attended all the required activities of the treatment program, including 25 clinical group sessions and nine individual counseling sessions. She had also submitted documentation showing that she had completed a parenting education course in April 2009. DCFS expressed concern at Kimberly G.'s delay in addressing her substance abuse issues and said that her progress thus far was "minimal." Kimberly G. had missed two recent drug tests in March and April 2010. She continued to visit with K.P. three times per week.

In reports for the court in June 2010, DCFS noted that Kimberly G. had tested positive on May 13, 2010, for opiates, codeine, and morphine, and she missed two following drug tests. The maternal great-grandmother reported that Kimberly G. had never been consistent in meeting a visitation schedule, but showed up unannounced when she wanted a visit. Kimberly G. made better visitation efforts when a hearing date approached. The maternal great-grandmother also told DCFS that Kimberly G. was "responsible in addressing K[.P.]'s needs but does not take action." For instance, when K.P. cried from hunger, Kimberly G. would instruct the maternal great-grandmother to prepare his bottle. When asked to feed K.P., Kimberly G. became aggressive and refused. The maternal great-grandmother stated that she encouraged Kimberly G. to be more involved in K.P.'s care but that Kimberly G. grew agitated and yelled that she did not need to be instructed in what to do for her son. K.P. was bonded to his maternal great-grandparents and identified them as his parents. Kimberly G. was unwilling to live with the great-grandparents in order to reunify with her son, and she had not explored any alternative living arrangements to permit reunification.

On July 13, 2010, the court found that Kimberly G. had partially complied with the case plan but that K.P. could not be returned to her physical custody,

and that there existed no substantial probability that K.P. would be returned to her within six months. The court terminated reunification services.

In reports prepared for the section 366.26 hearing, DCFS reported that K.P. demonstrated "a strong emotional attachment to his great-grandparents." He called them "Mama" and "Papa." They wanted to adopt him and DCFS concluded that he was likely to be adopted.

DCFS described Kimberly G. as maintaining regular visitation over the duration of the dependency proceedings. During visits, however, Kimberly G. "appear[ed] more concerned with her own feelings and needs than those of the child. For example, when the child [did] not refer to her as '[M]ama' she bec[ame] visibly frustrated and insist[ed] on the child calling her '[M]ama.'" Kimberly G. would refuse to give K.P. what he was asking for unless he called her "Mama." Kimberly G. also complained that she wanted to be the one providing diapers, snacks, and food to K.P. during visits, and eschewed the diaper bag the maternal great-grandparents provided so that she could demonstrate that she was a capable and responsible parent. After approximately two weeks, Kimberly G. failed to provide the needed items and maternal great-grandparents resumed providing for K.P.'s needs. DCFS found Kimberly to be unable to implement the parenting skills imparted by the parenting programs she had taken and to lack insight into K.P.'s needs.

Kimberly G.'s monitored visits with K.P. took place at DCFS offices. She had recently arrived half an hour late to a visit. She had also cancelled visits without explanation, then failed to appear for rescheduled visits. DCFS explained that Kimberly G. "feels entitled to see her child as she is the biological mother but refuses to take responsibility in following any arranged visitation schedule as she feels that she can request to see her child at any time she finds convenient for herself." Kimberly G. lacked "any commitment or serious intent to abide by any visitation schedule." At the conclusion of visits with Kimberly G., K.P. joyfully reunited with his great-grandfather.

Although Kimberly G. decided to continue drug testing after reunification services were terminated in an attempt to demonstrate her desire to comply with court orders, Kimberly G. repeatedly missed tests and twice tested positive for PCP. She had also been belligerent with DCFS workers on more than one occasion, and the social worker had smelled alcohol on her breath and body during one such incident.

The section 366.26 hearing was held on June 15, 2011. Kimberly G. testified that she believed that it was not in K.P.'s best interest for her parental rights to be terminated because, she said, "I feel I worked too hard for the bond that we have now. The relationship that we have is built up

stronger." She believed that termination would "interfere with his emotions; how he'll grow up feeling his mother wasn't in his life." She characterized her bond with K.P. as "very strong," and reported that he called her "Mommy" and smiled when he saw her. Kimberly G. described her weekly two hours of visitation: first they would play for five minutes, then they would go for a walk and to get something to eat, and then they would return to the DCFS office. During visits she changed K.P.'s diapers, tried to teach him English words, and acted as his parent. Kimberly G. said that at the end of visits, sometimes K.P. separated from her easily, but other times he did not want to let her go and threw tantrums.

Kimberly G. acknowledged that K.P. had been removed from her care when he was one month old, that he had never been returned to her care, and that her visitation had mostly been monitored. Kimberly G. testified that the last time she had had the care of K.P. personally was a period of six months in 2010 when she lived with her grandparents, with whom K.P. had been placed. This living arrangement occurred without DCFS's knowledge or approval. She changed K.P.'s diaper and fed him, and would "babysit" him when the grandparents were not home. She did not cook for him, but gave him food that was in the refrigerator.

Kimberly G. disputed DCFS reports that she had twice been belligerent at visitation. She denied having consumed alcohol on the date that the DCFS social worker smelled it on her. She denied having anger management problems and getting frustrated when K.P. did not address her as his mother.

The juvenile court terminated the parental rights of both parents. They appeal.

## DISCUSSION

■ At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826 [86 Cal.Rptr.2d 739].) To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that the minor is likely to be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) Then, in the absence of evidence that termination of parental rights would be detrimental to the child under statutorily specified exceptions (§ 366.26, subd. (c)(1)(A)–(B)), the juvenile court "shall terminate parental rights" (§ 366.26, subd. (c)(1)). Here, the juvenile court found that K.P. was adoptable, and, finding no reason that the termination of parental rights would be detrimental to him, terminated both parents' parental rights. Kimberly G. appeals the termination, asserting

that the parent-child relationship exception to termination of parental rights was applicable here. Father does not contend that the parent-child relationship exception applies with respect to his relationship with K.P.; instead, he joins in Kimberly G.'s arguments and contends that if the termination of Kimberly G.'s parental rights is reversed on this ground, reversal of the termination of his parental rights follows.

Section 366.26 provides an exception to the general legislative preference for adoption when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535]; see also *In re Derek W., supra,* 73 Cal.App.4th at p. 826 ["parent has the burden to show that the statutory exception applies"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108 [89 Cal.Rptr.2d 664]; see *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419 [35 Cal.Rptr.2d 162].) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [82 Cal.Rptr.2d 426].) Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 [93 Cal.Rptr.2d 644].)

For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination (see, e.g., *In re Autumn H., supra,* 27 Cal.App.4th at p. 576; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953 [124 Cal.Rptr.2d 688]), although at least one court has concluded that it is properly reviewed for an abuse of discretion (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351). Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315

[117 Cal.Rptr.3d 568] (*Bailey J.*).) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists, although section 366.26 does contain other exceptions—is, because of its factual nature, properly reviewed for substantial evidence. (189 Cal.App.4th at p. 1314.) The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *Bailey J.*, at p. 1315.) This " 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," is appropriately reviewed under the deferential abuse of discretion standard. (*Bailey J.*, at p. 1315.) We find the *Bailey J.* approach persuasive and apply its composite standard of review here.

The juvenile court found that the bond between Kimberly G. and K.P. was not "strong enough" to rise to the level meriting the application of the parental relationship exception to the termination of parental rights. The court explained, "the bottom line is one time a week visiting for two hours at a monitored setting and being able to go to a park or to the pond and getting a bite to eat does not constitute the type of parental bond necessary that the child would benefit from continuing this relationship as compared to the advantages of adoption. So I don't find a compelling reason for not terminating the parental rights." We understand the court to have found that some parent-child relationship existed here—that is, that Kimberly G. maintained regular visitation and contact with K.P. This factual conclusion is supported by substantial evidence. (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.) The evidence supports a determination that Kimberly G. did maintain regular visitation and contact with K.P. and that he had a "healthy" bond with her.

■ The court further concluded that the bond or relationship between K.P. and Kimberly G. was qualitatively insufficient to constitute a compelling reason for determining that termination of Kimberly G.'s parental rights would be detrimental to him. We review this conclusion for an abuse of discretion (*Bailey J., supra*, 189 Cal.App.4th at p. 1315), and find none. K.P. had been removed from Kimberly G.'s custody when he was less than one month old, and Kimberly G. had never progressed beyond monitored visitation. The quality of her visits with K.P. was limited, as Kimberly G. appeared unable to improve her parenting skills, failed to appreciate and meet K.P.'s needs, and became frustrated when he failed to meet her desires. While the weekly two-hour visits between K.P. and his mother may have been pleasant for both parties, there was no evidence in the record (beyond Kimberly G.'s

stated belief) that termination of the parent-child relationship would be detrimental to K.P. or that the relationship conferred benefits to K.P. more significant than the permanency and stability offered by adoption. We cannot say that the juvenile court abused its discretion when it concluded that any detrimental impact from severance of the limited relationship K.P. had with his mother was outweighed by the benefits to K.P. that would come from adoption. (See *Bailey J.*, at p. 1315 [juvenile court determines "the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption"]; *In re Autumn H., supra*, 27 Cal.App.4th at p. 575 [exception applies only if the severance of the parent-child relationship would "deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed"].)

## DISPOSITION

The judgment is affirmed.

Perluss, P. J., and Woods, J., concurred.