Filed 1/23/14  In re Marcus S. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MARCUS S., et al., Persons Coming Under the Juvenile Court Law. | B249893 |
| | (Los Angeles County Super. Ct. No. CK76222) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. TIERRA M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

# INTRODUCTION

Tierra M.'s two children, Marcus S. and T.S., were declared dependents of the court pursuant to Welfare and Institutions Code section 300, subdivision (b).[1]  After several years, the juvenile court terminated Tierra M.'s parental rights and selected adoption as the children's permanent plan.  Tierra M. appeals the order, arguing that the court erred by failing to apply the beneficial parental relationship exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i).  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Initial Referral and Detention*

#### 1.  *Events preceding the filing of the section 300 petition*

Tierra M. (mother) and M.S. (father) are the parents of two children:  Marcus S., born in May of 2007, and T.S., born in March of 2008.  Shortly after T.S. was born, the Los Angeles County Department of Children and Family Services (DFCS) received a referral alleging "general neglect" by mother.  The caller reported mother had tested positive for marijuana immediately after giving birth to T.S.

During an interview regarding the referral, mother told DCFS she had stopped smoking marijuana when she discovered she was pregnant with T.S.  Mother admitted, however, that she had taken a "charge" of marijuana–which she described as "when someone blows smoke into another person's mouth"–one week before T.S. was born.  Mother also admitted that, prior to her pregnancy, she smoked marijuana whenever she "came across it."  Father informed DCFS he had been smoking marijuana since the age of 16, but did not believe he was dependent on the drug.  Father stated that he had never smoked marijuana in the presence of his children and would "quit smoking today if it meant him keeping [them]."

Mother and father agreed to participate in voluntary family maintenance services that included substance abuse treatment, random drug testing and parenting education.  In

---

[1]    Unless otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

June of 2008, however, mother was terminated from her substance abuse program for "non-compliance"; father was terminated from his substance abuse program one month later. Between May and August of 2008, mother failed to report for six drug tests and tested positive for marijuana twice; during the same time period, father failed to report for five drug tests and tested positive for marijuana three times.

In August of 2008, DCFS scheduled a child safety conference to address the parents' failure to comply with their voluntary case plan. Father did not attend the meeting; mother agreed to voluntary placement of the children and reaffirmed her commitment to follow the case plan. Following the safety conference, mother enrolled in a new substance abuse program, but tested positive for marijuana in September and December.

In November of 2008, mother was hospitalized "because she attempted to commit suicide by putting a knife through her neck." According to medical staff, mother stated that she wanted to shoot herself and appeared to be suffering from borderline personality disorder. During an interview at the hospital, mother told DCFS she was depressed because her children had been taken away and because she had been arguing with father.

### 2. DCFS's section 300 petition

On February 10, 2009, DCFS filed a petition alleging that Marcus S., then one year and ten months old, and his female sibling T.S., then one year old, came within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b). The petition listed three allegations under subdivision (b): (1) mother's marijuana abuse interfered with her ability to care for her children and placed them at substantial risk of harm; (2) father's marijuana abuse interfered with his ability to care for the children and placed them at substantial risk of harm; and (3) mother suffered from mental and emotional problems that interfered with her ability to care for the children and placed them at substantial risk of harm.

In support of the petition, DCFS filed a report summarizing its investigation of the initial referral and the parents' subsequent failure to comply with their voluntary case plan. DCFS asserted that although it had provided the parents with voluntary services

3

that were intended "to eliminate the need for the children's removal from the home," the services had "not [been] effective." DCFS further asserted that the children faced a "very high risk" of harm if left in the parents' custody.

At the detention hearing, the court ruled DCFS had provided prima facie evidence that both children were persons described in section 300, subdivision (b) and that there were no reasonable means to protect them without removal. The court set the matter for a contested jurisdictional and dispositional hearing on March 18, 2009.

### B. *Jurisdictional and Dispositional Orders*

On March 6, 2009, DCFS filed a "Jurisdiction/Disposition Report." On March 3, 2009, father informed DCFS he had used marijuana for the "last five years to help with . . . [chronic] headaches" that began after he was shot in the head during a drive-by shooting. Father also told DCFS he knew mother had smoked marijuana while pregnant with T.S.

Father reported that mother began living with him at his parents' house when she was 16 years old. In 2008, father and mother were "kicked . . . out of [the] house" and began living "from motel to motel." Father stated that although he was currently living with mother in a one bedroom apartment, their unstable living situation made it difficult to "attend . . . drug treatment classes and submit to random drug testing." Father reported that he had never been employed, but received approximately $900 a month in "Supplemental Security Income."

Father also told DCFS that, in November of 2008, he had transported mother to a hospital after she "tried to cut her wrist." According to father, mother had remained hospitalized for one week and was diagnosed with depression and borderline personality disorder. Although mother was given medications while in the hospital, she was unable to refill her prescriptions. Father stated that, since stopping the medications, mother had been "okay" and "had [made] no threats of suicide or homicide."

Mother informed DCFS she had been residing with father in various different motels, which made it difficult to attend her substance abuse program or appear for her

4

drug tests. Mother stated that she had started smoking marijuana "on and off" when she was 12 or 13 years old, but eventually "stopped [taking the drug] on her own." She began smoking marijuana again eight days before T.S. was born, and then quit several months later. Mother was aware father smoked marijuana, but was not sure how frequently he used the drug or when he began to use it.

When asked about her hospitalization, mother stated that she had attempted "suicide by trying to cut [her] wrists." Mother said she attempted suicide because she was depressed about having her children taken away and being in the "system all [her] life." Mother stated that hospital personnel had diagnosed her with depression and borderline personality disorder. Following her release from the hospital, mother started seeing a physician at the Long Beach Mental Health Center.

The report stated that Marcus S. and T.S. had recently been placed with a new foster parent, Jacqueline Perkins. According to DCFS, the children appeared to be developing at an age appropriate level and adjusting well to their new placement. Perkins informed DCFS that the parents had visited the children at a McDonalds in early March and "acted appropriately" throughout the visit.

In its assessment and evaluation, DCFS recommended that, based on the parents' ongoing substance abuse issues and mother's failure to adequately address her mental health problems, the court should: (1) declare the children dependents of the court; (2) maintain the children's placement with Perkins; and (3) provide reunification services to both parents.

The court sustained the petition, declared the children dependents and approved a disposition plan that required both parents to attend drug rehabilitation with random drug testing and required mother to attend individual counseling. The court also provided both parents with monitored visitation. A six-month review hearing was scheduled for September 15, 2009. (See § 366.21, subd. (e).)

5

## C. Interim Status Hearings

### 1. Section 366.21, subdivision (e) six-month review hearing

On September 14, 2009, DCFS provided a status report for the six-month review hearing. (See § 366.21, subd. (e).) Perkins informed DCFS that mother had maintained a regular visitation schedule with the children throughout the six-month review period. Perkins normally brought the children to mother's home for two unmonitored visits per week, with each visit lasting up to four hours. Mother also called Perkins regularly to check on the children's well-being. Perkins believed mother spent "quality time" with the children, who were "very happy during her visits." Mother told DCFS the visits had "gone well" and that she was "happy to be bonding with her children." Despite the apparent success of the visits, DCFS had elected not to permit overnight visits because mother had failed to enroll in mental health counseling.

Perkins told DCFS that both children were in "good health," had showed substantial "developmental progress" and remained "active and playful with other foster children in her home." DCFS believed the children were continuing to "adjust[] well in their current placement" and that Perkins had provided them a "stable home environment."

DCFS also reported on the parents' efforts to comply with their court-ordered services. Between January and April of 2009, mother had completed four months of substance abuse counseling and provided 10 negative drug tests. Over the next four months, however, she had failed to appear for eight drug tests and had provided a positive test for alcohol. Mother also failed to comply with her mental health counseling obligations. In June of 2009, mother told her therapist she "did not feel the need to attend court order counseling [sic]" and repeatedly failed to return DCFS's messages regarding her counseling requirements. When mother finally contacted DCFS in September of 2009, she stated that she had not enrolled in counseling because she had been searching for employment. Mother also said she had been unable to remain in contact with DCFS because she did not have a telephone and had recently been evicted from her apartment.

6

Father had enrolled in a drug treatment program in April of 2009, but was terminated for non-attendance. He had tested positive for marijuana in February, March and April of 2008, and had missed tests in March, June, July and September. According to DCFS, father appeared to be "unmotivated in . . . . attending a substance abuse treatment program, or submitting to drug testing as ordered by the court."

In its assessment and evaluation, DCFS stated that while mother's "unmonitored visits with her children ha[d] gone well," she "continue[d] to minimize the seriousness of her [mental] condition." Father, on the other hand, had failed to comply with his drug rehabilitation requirements and had not provided a drug test in several months.

In October of 2009, DCFS filed a supplemental report stating that mother had started to attend individual counseling and was not experiencing any suicidal thoughts or depression. Therapist Iris Leary recommended that mother attend weekly sessions to address "anxiety, depression and lack of coping skills." Leary stated that although mother had been cooperative during her counseling sessions, she had not attended a session in the last three weeks. Leary believed these absences were caused, in part, by mother's "housing situation." When DCFS asked mother why she stopped attending the counseling sessions, she stated "there was no reason" and that she "just ha[dn]'t been going.'" Mother also failed to appear for a drug test on October 8, 2009. She had continued, however, to have unmonitored visits with her children twice a week.

At the six-month review hearing, the court ordered DCFS to allow mother overnight, unmonitored visits as soon as she completed two additional individual counseling sessions and provided one additional clean drug test. The court left all other orders in place and set the 12-month permanency hearing date for March 16, 2010. (See § 366.21, subd. (f).)

2. *Section 366.21, subdivision (f) 12-month permanency hearing*

On March 16, 2010, DCFS provided a status review report for the 12-month permanency hearing. (See § 366.21, subd. (f).) The report indicated mother had continued to have unmonitored visits with her children twice a week and "maintain[ed] phone calls regularly with [the caretaker] to check for the children's well being." Perkins

told DCFS the children were "always happy to go with mother" and that she believed the children were safe in mother's care. Father, however, had stopped visiting the children. DCFS reported father was also not in compliance with his case plan and had stopped communicating with the Department.

Mother told DCFS she looked forward to seeing her children at every visit and described them as her "joy." Although mother felt "blessed to [Perkins]," she did not want her children to be adopted. Mother stated that "reunifying [was] essential to her" and that she would "try her best" to regain custody of both children. When DCFS raised the possibility of unmonitored overnight visits, mother stated she did not have a permanent residence and was currently "sleep[ing] in different places." DCFS reported it had elected not to "liberalize[] to overnight weekend visits" based, in part, on mother's on-going failure to appear at her scheduled drug tests.

According to DCFS, the children exhibited a strong attachment toward Perkins and were developing appropriately. Marcus S., then almost three years old, was able to feed himself, clothe himself and "understand[] most sentences." T.S., then about two years old, was able to walk with good balance and communicate her needs.

At the 12-month review hearing, the court terminated reunification services as to father, ordered continued reunification services for mother and set the matter for an 18-month permanency review hearing.

*3. Section 366.22 18-month permanency review hearing*

On August 9, 2010, DCFS submitted a status report for the 18-month permanency hearing. (See §§ 366.21, subd. (g); 366.22.) DCFS reported that it had lost contact with mother and was unsure of her current whereabouts. Perkins informed the Department that mother was not visiting or calling the children as frequently as she had in the past. According to Perkins, mother had not spoken to or visited the children in over a month. The children, however, continued to thrive and develop at an age appropriate level. DCFS believed that Perkins was "stimulat[ing] them educationally" and meeting all of their needs.

8

In an interim report filed on October 7, 2010, DCFS stated that mother had not contacted the Department in two months and had not provided a current address or phone number. Perkins, however, reported that mother had begun visiting the children again. The children continued to "thrive" in Perkins's care.

In another interim report filed on December 15, 2010, DCFS stated that mother had still not contacted the Department, nor had she provided any updated contact information. Perkins reported that mother continued to visit the children during the weekends and that the children seemed to enjoy their visits.

DCFS recommended that, in light of mother's failure to maintain contact with the Department, the court should terminate her reunification services and leave the children in the custody of Perkins. After holding a hearing (which mother failed to attend), the court terminated mother's reunification services and scheduled a section 366.26 permanency plan hearing.

### D. Section 366.26 Permanency Plan Hearings

On April 13, 2011, DCFS submitted a section 366.26 report stating that the children were "continuing to thrive" in Perkins's care. Perkins told DCFS that, despite the termination of her reunification services, mother had increased her visits. Perkins explained that mother and father had joined Perkins's church in February of 2011 and were visiting with the children after church services. Perkins was "joyous of the parents' efforts to maintain a relationship" with their children and had noticed a significant change in their motivation. Perkins told DCFS she was interested in serving as the children's legal guardian and wanted the parents to have an opportunity to reunify at a later date. Perkins said she did not want to adopt the children because she was worried that she would become "overwhelmed."

In a supplemental report filed in June of 2011, Perkins stated that mother still did not have a "stable place for the children to visit her, so mother continues to see the children at church." During their visits, the children spent several hours "play[ing]" with their mother. Perkins stated that she had no concerns about leaving the children with

9

mother and that they were always "very happy to go with [her]." As with all prior reports, DCFS indicated that the children continued to thrive in Perkins's care.

In February of 2012, DCFS filed a report recommending that the court permanently place the children with Perkins, who had agreed to adopt them. DCFS stated that the children were happy in their current placement and had developed a "good relationship with each other and their caregiver." Perkins continued to meet all of the children's needs and informed DCFS that "caring for the children ha[d] been a joy."

DCFS also reported that, in the last month and a half, mother had only visited the children twice. Perkins stated that the visits had occurred at church, where mother played with the children. In a report filed in June of 2012, however, DCFS reported mother had resumed visiting the children twice a week after church. Mother normally took the children to a nearby park, played with them and braided their hair.

### E. *Mother's section 388 petition and permanency planning*
#### 1. *Section 388 petition and DCFS response*
In October of 2012, mother filed a section 388 petition requesting that the court terminate jurisdiction over the children and return them to her care, or, alternatively, renew her reunification services. In support of her request, mother presented evidence she had completed a substance abuse program and had addressed her depression through therapy. Mother acknowledged, however, that her housing situation had not improved.

DCFS recommended that the court deny the section 388 petition. DCFS reported that Marcus S., then four-and-a-half years old, had told a DCFS social worker that he did not want to live with his mother and preferred to continue living with Perkins. T.S., then three-and-a-half years old, stated that although she enjoyed visiting with her mother, she wanted to continue living with Perkins because she was "nice" and took good care of T.S. and her brother.

DCFS reported that when the children were asked why they enjoyed their visits with mother, they both stated that she bought them things. Perkins told DCFS she did not have any problem with the mother visiting the children, but did not believe mother was

ready to care for them.  DCFS also noted that mother had not contacted the Department for almost two years.

 In May of 2013, mother withdrew her section 388 petition and the court proceeded with a contested section 366.26 permanency plan hearing.

### 2. *The contested section 366.26 permanency plan hearing*

At the section 366.26 permanency plan hearing, mother told the court she thought it would be "insane to take [the children] out of [Perkins'] household," but asserted that she did not want to give up her parental rights.  Mother explained that although her financial condition had made it difficult to find stable housing, she intended to get "on [her] feet" and find "a place to stay."

Perkins testified that Marcus S. and T.S. had been in her care for approximately four-and-a-half years and that she wanted to adopt them.  Perkins stated that mother had been visiting the children every Sunday after church service for two to four hours; the visits normally occurred inside the church or at a nearby restaurant.  The number and duration of the visits had remained consistent over the last six months.  In addition to the visits, mother spoke with the children on the phone three times a week.  Perkins believed that the children had a "very close" relationship with their mother; they both called her "mommy" and frequently gave her hugs and kisses.  Perkins also testified that the children respected their mother and complied with her directives.

When asked why she wanted to adopt the children, Perkins stated that she had been caring for the children for a significant period of time and felt that she "was a mother figure to them."  She further stated, however, that she did not believe it would be in their best interests to terminate mother's parental rights.  Perkins explained she had gone "back and forth" on the question of adoption because she had been "pressured" by all the "different attorneys."  When asked to clarify her comments, Perkins said she had felt pressure two years earlier after an "adoption worker" told her the children would be removed from her home and placed elsewhere if she refused to adopt them.  Perkins explained that those statements had "scared" her "because [she and the children] have a bond."  Perkins further stated that mother "was still a part of their life, and because

11

[mother] was going through so much at the time . . . [Perkins had] just wanted to provide love and care to the kids and a home for the kids . . . ." Perkins also testified that, following the adoption, she intended to allow mother to continue visiting the children and wanted mother to have the opportunity to regain custody of her children.

Although Marcus S. was called to testify at the hearing, the parties and the court agreed he was not qualified to do so. The court, however, permitted the attorneys to ask him a limited number of questions. When Marcus S. was asked whether he wanted Perkins to be his mommy, he shook his head to the right and left; when asked whether he wanted his "mommy to stay his mommy," he said "yes."

DCFS argued that adoption by Perkins was the appropriate permanent plan, and that mother had failed to establish the beneficial parental relationship because "the[] children ha[d] been with Perkins their whole life." DCFS also contended the evidence showed Perkins had "provided a caring and loving home for them and . . . would like to continue that."

Mother, however, argued that she had established the beneficial parental relationship exception. In support, mother relied on Perkins's statement that she did not believe termination of mother's parental rights was in the best interests of the children. According to mother, Perkins had also made clear that legal guardianship would be in the best interests of the children because it would enable mother to "get back on her feet."

On May 13, 2013, the court ruled that DCFS had presented clear and convincing evidence that the children were likely to be adopted by Perkins. The court noted that the "only statutory exception [to adoption] asserted by Mother" was the beneficial parental relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). The court found, however, that mother had failed to demonstrate the exception applied: "Here the evidence establishes and the Court finds that there will be no interference, substantial or otherwise, with the relationship between Mother and the Children. Mother initially sporadically and then more frequently has visited with the Children on Sundays, with Perkins amicably arranging and participating in those visits. The court finds based on Perkins' testimony that these visits will continue uninterrupted after adoption is finalized.

12

In any event, the Court finds, having observed the children, Mother and Perkins, that the best interests of the children in finding permanency in their lives through adoption clearly outweighs any interest Mother might have in restricting that permanency by a plan of legal guardianship and that there would be no benefit to the children by adopting a plan of legal guardianship rather than adoption."

The mother appealed the trial court's order terminating her parental rights and selecting adoption as the permanent plan.

## DISCUSSION

The sole issue raised in this appeal is whether the trial court erred in ruling that mother failed to establish the beneficial parental relationship exception. (See § 366.26, subd. (c)(1)(B)(i).)

### A. *Summary of Relevant Law and Standard of Review*

"'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53 (*Celine R.*).)

At the section 366.26 stage of a dependency proceeding, adoption is the preferred choice. (*Celine R., supra*, 31 Cal.4th at p. 49; § 366.26, subds. (b) & (c).) "If it is likely the child will be adopted, the court must choose that option – and as a result terminate the natural parents' parental right – unless it 'finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of [several] specified [statutory] circumstances.' [Citation.]" (*Celine R., supra*, 31 Cal.4th at p. 49; § 366.26, subd. (c)(1)(B).) These "specified statutory circumstances – actually, exceptions to the general rule that the court must choose adoption where possible – 'must be considered in

13

view of the legislative preference for adoption when reunification efforts have failed.' [Citation.]." (*Celine R., supra*, 31 Cal.4th at p. 53.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference when the court finds that "[t]he parents . . . have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." "The 'benefit' prong of the exception requires the parent to . . . 'show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation]. Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).)

After a court has rejected a parent's effort to establish the exception, two different standards of review apply on appeal. (See *K.P., supra*, 203 Cal.App.4th at pp. 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Since the parent must first show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial parental relationship if supported by substantial evidence. (See *K.P., supra,* 203 Cal.App.4th at p. 621.; *Bailey J., supra,* 189 Cal.App.4th at p. 1314.) "[A] challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.'" [Citation.] (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.) Thus, "[u]nless the undisputed facts established the existence of a beneficial parental or sibling relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Ibid.*)

The second requirement for the exception is that the beneficial parental relationship constitute a "compelling reason for determining that termination would be detrimental." (§ 366.26, subd. (c)(1)(B); *K.P., supra*, 203 Cal.App.4th at p. 622.)

Although grounded in the facts, the court's determination on this issue is a "'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J., supra*, 189 Cal.App.4th at p. 1315; *K.P., supra*, 203 Cal.App.4th at p. 622.)

### B. The Court Did Not Abuse its Discretion in Finding That the Benefits of Adoption Outweighed Any Detrimental Impacts that Might Result from Severance of the Parental Relationship

The trial court's order does not indicate whether mother established the existence of a beneficial parental relationship.[2] We will therefore assume mother successfully demonstrated a parental relationship and consider only whether the court abused its discretion in concluding the relationship was "qualitatively insufficient to constitute a compelling reason for determining that termination of [her] parental rights would be detrimental to [the children]." (*K.P., supra*, 203 Cal.App.4th at p. 622; see also *Bailey J., supra*, 189 Cal.App.4th at pp. 1316-1317.) In making this determination, the court was required to weigh the detrimental impact the children would suffer from severing the parental relationship against the benefits they would enjoy through their adoption. (*In re C.F.* (2011) 193 Cal.App.4th 549, 557 [exception applies only if "the benefits of continuing the parental relationship outweighed the benefits of permanent placement"].)

Numerous factors support the court's decision to terminate mother's parental rights. First, both children were removed from mother at a very young age and remained in Perkins's care for a substantial portion of their lives. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 467 (*Angel B.*).) [when assessing the parental relationship exception,

---

2 The trial court's order states only that the evidence presented at the hearing showed "the best interests of the children in finding permanency in their lives through adoption clearly outweigh[ed]" any detrimental impacts the children might suffer from severing the parental relationship.

courts may consider "the age of the child" and "the portion of the child's life spent in the parent's custody"]; *K.P., supra*, 203 Cal.App.4th at p. 622 [denial of exception supported, in part, by young age of defendant at time of removal].) Marcus S. was only 15 months old when he was removed from mother's custody; T.S. was only five months old. Prior to the termination of mother's parental rights, the children had been in Perkins's care for more than four years. Thus, Marcus. S. had spent almost 80 percent of his life outside of mother's custody, while T.S. had spent almost 90 percent of her life outside mother's custody.

Second, during the four year detention period, mother did not maintain day-to-day interactions with her children. (See *K.P., supra*, 203 Cal.App.4th at p. 621 [although "not necessarily required" to establish the exception, "'[d]ay-to-day contact is . . . typical"].) Mother generally visited the children once or twice per week. At times, however, her visits were more sporadic. During a two month period in 2010, she did not have any visits with the children; during a six week period in early 2012, she only visited the children twice. Moreover, her visits never progressed to overnight status.

Third, although the record indicates mother shared a positive relationship with her children, there is no evidence that it "transcend[ed] the kind of relationship the child[ren] would enjoy with another relative or family friend." (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523 [to establish the exception, "the child's relationship must transcend the kind of relationship the child would enjoy with another relative or family friend"] [disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413].) During her visits, mother played with the children, bought them food and braided their hair; the children gave mother hugs and kisses, called her "mommy" and listened to her directives. However, the mere fact that mother "maintained a relationship that may [have] benefit[ted] the child[ren] to some degree" (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449) is "simply not enough to outweigh the sense of security and belonging an adoptive home would provide." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81 [evidence that mother "loved her children . . .[], she fed and changed them during visits, and sometimes they would call her 'Mom[]' . . . [was] simply not enough to outweigh the sense of

16

security and belonging an adoptive home would provide"].)  The record makes clear that, for the significant majority of the children's lives, Perkins has served as the children's "de facto parent, and she is the person who has provided for [their] 'physical care, nourishment, comfort, affection and stimulation.'  [Citation.]" (*Bailey, supra*, 189 Cal.App.4th at p. 1316.)

Fourth, mother has pointed to no evidence indicating that the child "has any particular needs that can be met by [m]other but not by the [adoptive parents]." (*Angel B*., *supra*, 97 Cal.App.4th at p. 467 [mother's failure to identify any needs that could not be met by adoptive parents supported juvenile court's finding that the parental relationship exception did not apply].)  During the four year detention period, DCFS consistently reported that Perkins was meeting all of the children's needs and providing them with a "stable," "nurturing home."  DCFS also reported that the children were developing appropriately, appeared healthy and exhibited a strong attachment to Perkins, who felt that she had become their "mother figure."

Finally, mother has cited no evidence suggesting that severing the children's relationship with her would have a significant, detrimental impact on their well-being. DCFS's reports do not indicate that the children had difficulty separating from mother at the end of their visits; nor do the reports show that the children experienced hardship or distress during the extended time periods when mother's visits stopped or became more sporadic.  The record also contains no bonding study or expert evidence suggesting that the children might suffer from a severance of the relationship.

In sum, while it may be inferred from the record that mother and children enjoyed their visits together, "we cannot say the that the [juvenile] court abused its discretion when it concluded that any detrimental impact from severance of the [parental] relationship . . . was outweighed by the benefits to [the children] that would come from adoption." (*K.P., supra*, 203 Cal.App.4th at p. 623; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [exception applies only if the severance of the parent-child relationship would "deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed"].)

17

Mother, however, argues that we must nonetheless reverse the juvenile court's ruling on the beneficial parental relationship exception because it was based on improper criteria. Specifically, mother asserts that the court chose not to apply the exception based on Perkins's assurances that, following the adoption, she would continue to allow mother to visit the children.

Two prior decisions–*In re C.B.* (2010) 190 Cal.App.4th 102 (*C.B.*) and *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*)–have held that a juvenile court may not deny the beneficial parental exception based solely on the "the prospective adoptive parents' willingness to allow the children to have continued contact with mother." (*C.B., supra,* 190 Cal.App.4th at p. 128; *S.B., supra*, 164 Cal.App.4th at p. 300 ["We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"].) As explained in *C.B.*: "[I]f a juvenile court determines that a parent has [established a beneficial parental relationship] and that the benefit from continuing that parent-child relationship . . . 'promotes the well-being of the child to such a degree as to outweigh' the benefit that child would gain from the stability and permanency of adoption [citation], then the parent-child relationship exception is established. In those circumstances, the court cannot nevertheless terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation." (*C.B., supra*, 190 Cal.App.4th at pp. 128-129.)

In this case, however, the trial court never found that the benefits the children would derive from maintaining their relationship with mother outweighed the benefits they would enjoy from adoption. Indeed, the court found just the opposite. Nor did the court base its decision to terminate parental rights on Perkins's assurances that she would permit visits in the future. Although the court's order observed that mother's relationship with her children was likely to continue given Perkins's assurances she would allow visits after adoption, the very next sentence clarified that denial of the exception was not based on this factor: "In any event, the Court finds, having observed the children, Mother

18

and Perkins, that the best interests of the children in finding permanency in their lives through adoption clearly outweighs any interest Mother might have [in preserving her parental rights]." *C.B., supra,* 190 Cal.App.4th 102 and S.*B., supra,* 164 Cal.App.4th 289 are therefore inapplicable.

## DISPOSITION

The juvenile court's orders are affirmed.


ZELON, J.

We concur:


PERLUSS, P. J.


WOODS, J.