Filed 10/4/16  In re S.H. CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.H., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. JONATHAN H., Defendant and Appellant. | F073667 (Tuolumne Super. Ct. No. JV7524) **OPINION** |

THE COURT[*]

APPEAL from an order of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, and Cody M. Nesper, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

_____

[*]        Before Kane, Acting P.J., Detjen, J., and Smith, J.

Appellant Jonathan H. (father), appeals from the juvenile court's order terminating his parental rights to his now six-year-old son, S.H. (Welf. & Inst. Code, § 366.26.)[1] Father contends the juvenile court erred in not applying the exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i) (hereafter "the beneficial relationship exception"). We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

S.H. was placed in protective custody in September 2014 after his mother, Barbara, and father were determined to be under the influence of methamphetamine. Barbara had recently married a registered sex offender who was incarcerated in county jail. Father, who was restrained from having contact with Barbara, was found in her home. He was homeless and camping in the woods and Barbara allowed him to occasionally sleep and shower at her house. Father had previously lost his parental rights to another child because of substance abuse and domestic violence, which also included Barbara and the child's mother. Father reported having a very close relationship with S.H. who was diagnosed with Autism Spectrum Disorder. He and S.H. sometimes spent weekends with S.H.'s paternal grandmother.

On September 26, 2014, the juvenile court ordered S.H. detained and ordered visitation. Father did not appear at the hearing. The Tuolumne County Department of Social Services (department) placed S.H. in foster care.

Father did not maintain contact with the department or visit S.H. over the next two weeks. When asked about this, he said he did not attend the detention hearing because he "had the stomach flu." He said he had not been visiting because he was not allowed to because he tested "dirty." However, he also said that he last used methamphetamine on the day S.H. was taken into protective custody.

---

[1] Statutory references are to the Welfare and Institutions Code.

On October 7, 2014, father reported for a scheduled visit and tested positive for THC (marijuana). He said he smoked a "bowl" of marijuana that morning. Upon seeing him, S.H. exclaimed, "Daddy!" Father was allowed to visit S.H. and they played with blocks and a train. On October 9, 2014, father arrived 45 minutes late for a visit and was not allowed to visit S.H. He explained he was homeless and had to walk to the visit, however, was observed being dropped off and picked up. The following day and again on October 28, 2014 he tested positive for marijuana.

Father told a social worker he had " 'undiagnosed Asperger's Disease and anxiety' " and was being treated by a physician. He was homeless and living in a tent on a friend's property. He was not allowed to live at the homeless shelter because of his history of violence.

On November 6, 2014, father tested positive for methamphetamine prior to a visit with S.H. He denied using methamphetamine, explaining he was exposed to the drug when a friend smoked methamphetamine while staying with him in his poorly ventilated trailer. He was initially told he could not visit S.H. but the social worker acquiesced when S.H. saw him and yelled for him, hugged him and motioned for him to walk to the visitation room. Father failed to show for his visit scheduled the following week.

The juvenile court exercised its dependency jurisdiction over S.H. at a dispositional hearing in December 2014 and ordered father and Barbara to participate in reunification services. In April 2015, Barbara waived services. She said she loved S.H. but did not believe it was in his best interest to reunify with her or father. She wanted S.H. to be adopted by a family who could provide the safety and stability she could not.

Father received reunification services until November 2015. However, he failed to prove himself a safe and protective father. In March 2015, he assaulted Barbara in a home they shared with father's girlfriend, Jennifer, Jennifer's two children and Jennifer's husband who was also Barbara's ex-husband. Father was arrested and charged with domestic violence. In October 2015, Jennifer forced him to leave her home after he

3

backed her into a corner, causing her to fear for her life. That same month, he was diagnosed with bipolar disorder and antisocial personality disorder. By the end of the 12 months, he was consistently visiting S.H. twice weekly for two hours under supervision but made minimal progress in completing his services plan. At a contested 12-month review hearing in November 2015, the juvenile court terminated his reunification services and set a section 366.26 hearing.[2] The court reduced father's visitation to one supervised visit a month for one hour.

In its report for the section 366.26 hearing, the department recommended the juvenile court terminate father and Barbara's parental rights and select adoption as S.H.'s permanent plan. S.H. was healthy and not displaying any emotional or behavioral problems and was appropriately bonded to his caregivers and older foster brother with whom he had lived since January 2016. The adoptions specialist opined that S.H. was likely to be adopted and would benefit from adoption and that his caregivers were suitable adoptive parents and were committed to adopting him. S.H. visited father and Barbara once monthly under the department's supervision.

In April 2016, the juvenile court conducted a contested section 366.26 hearing. The parties stipulated that father maintained regular visitation and contact with S.H., thus satisfying the first prong of the beneficial relationship exception to adoption. Cora Beach, the mother of father's then six-year-old biological daughter, testified that she had observed father with S.H. "all over town" and that S.H. was bonded to him. Father's stepfather, Vance Varela, also testified to their bond, having observed them together on an almost daily basis. When S.H. needed one of his parents or was insecure, he went to father. Varela opined terminating father's parental rights would be detrimental because it would deprive S.H. of father's guidance and place him at risk of maladjustment.

---

**2**    Father challenged the juvenile court's setting hearing by writ petition which we denied. (*Jonathan H. v. Superior Court* (Mar. 9, 2016, F072817) [nonpub.opn.].)

4

Father testified S.H. (Sammy) was autistic with a nine-month global developmental delay and that he was Sammy's primary parent until he was removed. During that time, he managed his special learning and dietary needs. Asked to describe his bond with Sammy, he gave the example of being the only one who could understand a personal language Sammy developed that consisted of garbled words. When he read to Sammy, Sammy sat on his lap. When visits ended, Sammy cried. He believed it would be detrimental to Sammy to terminate his parental rights because Sammy asked him at nearly every visit, "Daddy, when am I coming home?" and acted out in aggression after their visits. He did not believe that the court would return Sammy to his custody but hoped he could see him once in a while. He wanted to see him grow up. Sammy would benefit because he would have two fathers who would be there for him.

On cross-examination, father was asked about a visit in February 2016, after which he allegedly followed the foster parents and yelled that they were not Sammy's real parents. He denied that the incident occurred. He was also asked about his most recent visit which occurred in March 2016. He remembered being pulled out of the visit because he told Sammy he may not see him anymore in an attempt to prepare him for losing his parental rights. Sammy became upset. Father denied telling Sammy at that visit that he could use physical violence.

Father further testified that he and Jennifer were living together with two roommates. He denied he and Jennifer had an incident of domestic violence but said he called the police out to their home because he did not feel safe. One of Jennifer's friends was under the influence of alcohol and drugs and wanted to fight him. He denied that Jennifer had substance abuse problems but said she had uncontrolled bipolar disorder.

Social worker Macejko DeLacy, on rebuttal, testified that father upset Sammy at the February visit by telling him that he could visit him in his new home and perhaps even stay with him. After the visit, father followed Sammy to the vehicle where his foster parents were waiting. Father yelled, "[T]hat is not your family, that is not your

dad. I'm still your dad." Father's outburst upset Sammy and caused the foster parents to fear him. Prior to the next hearing in March, DeLacy told father not to discuss future contact with Sammy and father became irate. After the visit, Sammy told his foster parents that father told him it was okay to use physical violence if someone upset him and demonstrated some wrestling and fake fighting moves for Sammy. Subsequently, Sammy hit another child at school, the family dog and his foster brother and began talking about guns and police. When he got upset, he said things such as "You're going to pay." Prior to that, Sammy had not hit anyone.

DeLacy believed that father and Sammy were bonded but saw no benefit to Sammy of having father in his life.

The juvenile court found that Sammy was likely to be adopted and that the beneficial relationship exception did not apply. The court terminated father and Barbara's parental rights and selected adoption as the permanent plan.

## DISCUSSION

Father contends he established the existence of the beneficial relationship exception and, therefore, the juvenile court erred by terminating his parental rights. He argues the juvenile court should have ordered legal guardianship. We disagree.

Section 366.26 governs the proceedings at which the juvenile court must select a permanent placement for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the court determines it is likely the child will be adopted, the statute mandates termination of parental rights unless the parent opposing termination can demonstrate that one of the statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B).)

Father contends the exception found in section 366.26, subdivision (c)(1)(B)(i), i.e. the beneficial relationship exception, applied in his case. The beneficial relationship exception pertains where the evidence supports "a compelling reason for determining that termination would be detrimental to the child [because] [the parent maintained] regular

6

visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) " 'To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination.' [Citation.] A beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' " (*In re Marcelo B*. (2012) 209 Cal.App.4th 635, 643.)

The nature of the relationship between the parent and child is key in determining the existence of a beneficial relationship; it is not sufficient to show that the child derives some benefit from the relationship or shares some " 'emotional bond' " with the parent. (*In re K.P*. (2012) 203 Cal.App.4th 614, 621 (*K.P*.).) "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B*. (2002) 97 Cal.App.4th 454, 466.) In other words, the parent must show he or she occupies a " ' "parental role" in the child's life.' " (*K.P*., *supra*, 203 Cal.App.4th at p. 621.) Factors to consider include " ' "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." ' " (*In re Marcelo B*., *supra*, 209 Cal.App.4th at p. 643.)

The parent has the burden of proving the statutory exception applies. (*In re Megan S*. (2002) 104 Cal.App.4th 247, 252.) The court's decision a parent has not satisfied this burden may be based on either or both of two component determinations— whether a beneficial parental relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review

7

is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) When the juvenile court concludes the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion. (*K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622.)

The parties stipulated that the beneficial exception to adoption applies insofar as father maintained regular visitation and contact with S.H. Further, it is undisputed that father and S.H. are bonded. The question is whether terminating parental rights would be detrimental to S.H. or phrased differently, whether severing S.H.'s relationship with father would deprive S.H. of a substantial, positive emotional attachment such that S.H. would be greatly harmed. The only evidence bearing on the issue was father's testimony that S.H. wanted to return to his custody and acted out following visits and Varela's testimony that S.H. would miss out on father's guidance. However, father offered no evidence that the nature of S.H.'s bond went beyond a desire to be with him or that the severance of the bond would result in substantial emotional harm. In effect, he failed to show that he fulfilled a parental role in S.H.'s life.

On appeal, father contends evidence he was S.H.'s primary caregiver for the first four years of his life and found unique ways to communicate with him compelled a finding he fulfilled a parental role. We disagree. By the section 366.26 hearing, S.H. had been in foster care for 17 months and father's contact with him had not progressed beyond supervised visitation. Further, S.H. flourished in his foster care placement and made many strides whereas in father's care he was exposed to ongoing substance abuse and domestic violence. As to father's unique ability to understand S.H.'s speech, the court considered this an indulgence that prevented S.H. from learning to speak properly rather than an indication that father was filling a parental role.

8

While the evidence supports father's contention he and S.H. shared a loving bond, that evidence does not compel a finding he had a beneficial relationship with him as a matter of law.  (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527.)  Consequently, the beneficial relationship exception to adoption does not apply and the juvenile court did not err in terminating father's parental rights.

## DISPOSITION

The April 19, 2016 order terminating parental rights is affirmed.