Filed 4/30/14  In re Julio C. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JULIO C., et al., Persons Coming Under the Juvenile Court Law. | B251098<br>(Los Angeles County<br>Super. Ct. No. CK80668) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LESLIE M.,<br><br>    Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

        Jonathan B. Steiner and Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kimberly A. Roura, Deputy County Counsel, for Plaintiff and Appellant.

_____

A mother appeals from an order of the juvenile court terminating her parental rights over two of her five sons. She contends that the court erred in terminating her parental rights under Welfare and Institutions Code section 366.26 because the beneficial sibling relationship exception, found in section 366.26, subdivision (c)(1)(B)(v), should apply.[1] We affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

Twins Julio C. and P. C., born in March 2011, are the only subjects of this appeal. At the time of the twins' birth, their three older brothers, Giovanny (born September 2002), Frankie (born July 2008), and Douglas (born January 2010), were already juvenile court dependents. The juvenile court took jurisdiction over the older boys in February 2010, after Douglas was born with methamphetamine in his system. The court found the boys' mother, appellant Leslie M. (mother), had a lengthy history of substance abuse which placed the children at risk. The three boys were removed from the care of mother and Julio C. (father, who is not a party to this appeal), and placed in foster care. The twins were born premature, and a hospital referral reported that mother refused to feed or burp them, and appeared depressed, distant and unconcerned about the newborns. Mother and father participated in a voluntary family maintenance program for the twins from March until October 12, 2011. In June 2011, when the twins were about three months old, the three older boys were returned to the parents' care.

Respondent Department of Children and Family Services (DCFS) received a new referral alleging general neglect in mid-January 2012. According to the referral, mother had reported that the boys had been watching TV when father heard screaming. Father found Douglas with blood in his nose. Giovanny was also bloodied, and Frankie had bloody nose and, possibly, a broken blood vessel in one eye. The responding social worker reported that, on the second of two occasions on which she went to investigate the referral, she was almost

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

unable to walk through the family home, which was filthy and full of trash. Mother explained that Frankie had been hit by another child, and that Giovanny had also hit Frankie the same day, causing a nosebleed. Douglas had a fresh bite mark where Frankie had bitten him. Giovanny said Frankie had annoyed him, so he used his hand to hit his brother on the head. Frankie had a black eye from an unrelated child. Mother had not sought medical attention for Frankie's injuries. The parents admitted that father, who had a medical marijuana card for his back pain, began smoking marijuana again once the parents stopped being required to drug test for DCFS. Mother cleared the trash from the home, and took a drug test, which was clean.

In early February 2012, DCFS filed a nondetained petition, pursuant to section 300, subdivision (b) on behalf of the twins, and in order to provide additional services to the family. On a subsequent visit to the family's home for a scheduled appointment, DCFS staff found Giovanny, Douglas and the twins home alone. The worker heard the children inside, knocked on the door multiple times and called the home phone number with no answer. After about 10 minutes, mother emerged from another apartment at the shelter and returned to the family's apartment, which was filthy. DCFS determined it was necessary, due to safety and other concerns, to detain all five children from the parents.

On February 14, 2012, when social workers came to remove the children, they found Giovanny wandering around the shelter. After accompanying him back to the family's apartment, they observed foul odors, old food in one crib and the children were very dirty. The maternal grandparents (MGP's or, when mentioned individually, MGF and MGM), by then already caring for Douglas, took in the other four children. The same day, the court ordered that the twins be detained in the MGP's care and gave the parents monitored visits. Three days later the court ordered that the older three boys be detained with the MGP's.

Within two weeks, all the children were removed from the MGP's care after one of the 11-month-old twins was injured in mother's care during a visit that was supposed to have been monitored by MGM. Mother, unsupervised, was in a bedroom with the twins. While mother was changing diaper of one of the twins, the other boy pulled a table over and it landed on his head. Mother and MGM sought medical attention for the injured infant. On

3

February 27, 2012, the juvenile court ordered the children removed from the MGP's care. At that time, Giovanny was separated from his brothers and placed by himself in one foster home, and the four younger children were placed together in another. DCFS recommended the separation because of Giovanny's "aggressive behaviors with his younger siblings which include hitting them in anger and frustration, and rough interactions." DCFS promised to make an effort to ensure regular sibling visits.

The adjudication hearing was conducted on March 7, 2012. In its report for that hearing, DCFS reported that Giovanny said he "punched Frankie [because] he was getting [o]n [his] nerves," and that Frankie always bit people. Mother told the social worker Frankie needed therapy for his biting issues. Giovanny was in therapy to learn to deal with his aggressive behavior. The report also reflected DCFS's observation that mother had ongoing issues with depression underlying her substance abuse and parenting problems, and that she had not taken advantage of counseling services. The court asserted jurisdiction over the children under section 300, subdivision (b), terminated its home of parents order as to the three eldest children and ordered permanent placement services for all five children. Mother was given monitored visits, and father was permitted unmonitored visitation so long as his drug tests were negative. The court ordered relative placement for Giovanny, and suitable placement for the other children.

Giovanny was again placed with his MGP's. The four youngest siblings were placed together in a foster home. However, in early May 2012, all four children were removed from that foster home after the caretakers complained they could no longer work with the parents who were disrespectful and critical of them. DCFS tried to, but could not, find a foster home willing to take all four siblings. On May 3, 2012, Douglas and Frankie were placed in one foster home and the twins in another. The parents and MGP's visited the children regularly and appropriately. Giovanny, who reportedly missed his siblings and was struggling with his separation from them, also visited the twins when the MGP's did so.

In August, the twins' foster mother told DCFS she could no longer care for them because they displayed too many negative behaviors, including biting and hitting each other and her other foster children. Although the twins had made positive changes, the foster

4

mother recommended that they be in separate placements because of the risk that they could severely hurt one another. By September 28, 2012, the twins had been moved to two more foster homes. Their current caretakers were not interested in adoption. Mother, the MGF and Giovanny visited the twins twice a week.

On October 22, 2012, the juvenile court found that mother and father had not complied with their case plans, and terminated reunification services. Monitored visits were continued, the court ordered an adoptive home study for the twins and set the matter for a selection and implementation hearing in mid-February 2013.

In November 2012, DCFS reported that the twins, who had been in five different placements, had had 20 sibling visits with Giovanny in the past six months, but none with Frankie or Douglas, who were now placed in separate foster homes. All four of the younger boys had been moved several times since their February 2012 detention; the boys were considered a "handful" and "no foster home wanted them together." The children's behavior began stabilizing after they were separated.

On February 19, 2013, the juvenile court ordered DCFS to provide an update regarding adoption for the twins. No prospective adoptive parents had been identified yet, and DCFS was ordered to address the possibility of placing them with the MGP's, in whose care Giovanny was doing well. The MGP's wanted to adopt all five boys. DCFS reported that Frankie, Douglas, and the twins were doing well in their foster homes. The twins were developing well and enjoyed playing together, but their foster parent was not interested in adoption. Visits for the parents and grandparents were scheduled for three separate days and times for the twins, Frankie, and Douglas. Giovanny participated in the visits. He expressed feeling happy during visits with his brothers, and wanted more visits.

According to DCFS, the children did not have "consistent sibling visits due to long distances among foster parents, school schedules of minors Frankie and Giovanny and foster parents['] issue with driving long distances." On February 21, 2013, DCFS coordinated a sibling visit for Frankie, Douglas, and the twins by taking the two older boys to the twins' foster home, where the children spent two hours together. DCFS indicated it would continue making reasonable efforts to arrange sibling visits. DCFS noted that in the past, the boys'

5

aggressive and disruptive behavior had made it impossible to place the siblings in a single placement. But the children had stabilized in their current placements, and their current caregivers expressed no concerns. DCFS was concerned that if the children were returned to the MGP's, their disruptive behavior might resurface due to a lack of structure and parenting skills in the MGP's home. DCFS identified prospective adoptive parents in February 2013, and began the preplacement process.

On March 6, 2013, the juvenile court ordered DCFS to prepare a progress report to address the possibility of adoption of the three eldest boys by the MGP's, and their participation in services. DCFS was also ordered to facilitate sibling visits.

On March 28, 2013, the twins were placed in a preadoptive home with caregivers Mr. A. and Mr. H., with whom they remain. DCFS reported that the twins were adjusting well, their caregivers were meeting all their needs and the family was developing a close and loving relationship with the children. The caregivers were strongly committed to adopting the twins.

MGF had weekly monitored visits with the twins, although he missed several in April, May, and June. In late April 2013, he began attending parenting classes and counseling. MGM had not enrolled in any programs.

At a hearing on June 18, 2013, mother's counsel informed the court that only one sibling visit had taken place, and asked that sibling visits immediately be facilitated. DCFS was ordered to address "the status of sibling visits" in its next report. That report, submitted in July, reflected that Frankie, Douglas, and the twins had one two-hour sibling visit in July 2013. The boys played soccer, ate snacks and interacted cheerfully at a park. DCFS reported that the boys had not had sibling visits due to conflicting school schedules, and because some foster parents were unable to drive long distances. DCFS expected the boys would have monthly sibling visits during summer, but that the frequency would taper off again once school began. DCFS noted that Giovanny saw his siblings during the MGP's visits.

On July 9, 2013, separate counsel was appointed to represent the twins after the boys' counsel declared a conflict, and the matter was continued.

6

At a hearing on August 20, 2013, father's counsel informed the court that sibling visits had not been occurring as often as they should be. DCFS was ordered to establish a regular visitation schedule. Mother requested visits with all five boys together. The court ordered DCFS to see if such visits could be arranged.

On August 30, 2013, the MGP's filed a section 388 petition seeking to have all five boys placed in their care, on the ground that they wanted to "maintain the strong familial bond and relationship." The allegedly changed circumstances was the MGP's participation in court-recommended services and ongoing weekly visits with the children.

In its final status review report for the September 4, 2013 hearing, DCFS reported that Giovanny was doing well in the MGP's home. Through therapy, he had learned ways to communicate his needs without responding aggressively toward his peers, and had discussed sibling separation and visits. Frankie was doing well in his foster home, but wanted to live with his MGP's. DCFS reported that Douglas was also doing well in his foster home. The twins too were doing well in the care of their foster parents, who were committed to adopting them. The twins were developing well, and responding to services from the Regional Center. The twins' vocabulary was increasing, and they were learning to feed themselves. Their disruptive behaviors had diminished, although some biting was ongoing. One teacher told DCFS she believed the biting behavior was the result of the boys' frustration with an inability to communicate and that as their vocabulary increased, the biting would decrease. The family continued to develop a close and loving bond. The twins had become very attached to their prospective adoptive parents, and "w[ould] run with great joy when [the] caregivers show[ed] up to the daycare to take them back home."

MGF had consistent weekly monitored visits with the twins, who responded well to him. MGM had visited inconsistently, and the twins often ran from, and refused to interact with her, unless she offered them junk food. The parents' visits were inconsistent, but they acted appropriately when they came. The report indicated that an August 2013 sibling visit had been considered, but did not say whether one occurred. MGF was taking parenting classes and counseling, and MGM had begun parenting courses.

7

On September 4, 2013, the juvenile court first addressed the MGP's section 388 petition, and observed that it lacked any new information. Mother's counsel requested that all five boys be placed with their grandparents. Counsel for the three oldest children asked that plans be made to return Frankie and Douglas to the grandparents, noting they were "very differently situated from the younger twins," and argued it was in the three older boys' best interest to be together. Counsel for the twins requested that the petition be denied as to them. He noted that one of the twins had been injured due to MGM's failure to supervise mother, and that the grandparents had not visited often: MGF came about twice a month, and MGM had hardly visited at all until recently. Moreover, it was not in the twins' best interest to be returned to their grandparents. The children were "thriving in the home," of their prospective adoptive parents and would be adopted if parental rights were terminated.

The court agreed and denied the petition as to the twins. The court observed that the cause for the children's removal from the MGP's had been very serious. Moreover, the two-year-old twins were not bonded to their older brothers in the same way the older siblings might be to them. In addition, five children was a lot for two older adults to care for. The court observed that the twins appeared to be thriving in their preadoptive home. The court also denied the petition as to the three older boys, but observed that as those boys were on a "totally different track" than the twins, their plan was to work toward placing them with the MGP's.

The court then proceeded to the section 366.26 hearing as to the twins.

Mother testified that at first, the twins had not wanted to leave when visits ended. Now they seemed to have adjusted. In recent visits, she had tried to explain to the twins who their mother, grandparents and oldest brother was. They ran to her during visits, were happy and called her "mommy" or "mama." They used "papa" to refer, not to father, but to their foster father. Mother believed there had been two sibling visits in 2013 between the four younger children, and that Giovanny visited his siblings with his MGF. Giovanny told the court he wanted his brothers to be with him on his upcoming birthday.

Mother argued the parental and sibling relationship exceptions should apply to prevent termination of parental rights. With regard to the sibling relationship exception, she

8

asserted that DCFS had not made reasonable efforts to facilitate sibling visits. Father joined mother's argument.

Counsel for the three oldest boys informed the court that her clients wished to be reunited with their brothers.

The twins' attorney urged the court to terminate parental rights. He noted that the twins had been separated from their siblings since they were 11 months old, and that under the circumstances, it was difficult to argue that the siblings had formed a significant bond. Counsel argued it was in the twins' "best interest to remain with the current adoptive parents as they are thriving . . . , and it would be a detriment for them to be removed from that setting."

The juvenile court agreed. The court observed that after having had to be moved from several foster homes, the twins had found "a place where they're thriving, doing exceptionally well." The court also observed that, while it did not "doubt that the older children are bonded to the younger children, . . . it would be very difficult for [it] to see these younger children are bonded in that way to the older kids." After expressing its hope that future sibling visits could be facilitated, the court found the twins adoptable, found that no exception applied and terminated parental rights as to them.

Mother's counsel asked that the twins' matter be referred to the Consortium for Children, indicating that the prospective adoptive parents had indicated their willingness to allowing ongoing sibling visits. The court agreed a referral was appropriate "to see if we can work out future sibling visits." Mother filed this timely appeal.

**DISCUSSION**

Mother contends that the juvenile court erred in terminating her parental rights because it should have applied the sibling relationship exception to termination under section 366.26, subdivision (c)(1)(B)(v).

"At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. [Citation.] To implement adoption as the permanent plan, the juvenile court must find, by clear and convincing evidence, that the

9

minor is likely to be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) Then, in the absence of evidence that termination of parental rights would be detrimental to the child under statutorily specified exceptions (§ 366.26, subd. (c)(1)(A)–(B)), the juvenile court 'shall terminate parental rights' (§ 366.26, subd. (c)(1))." (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.)

"The sibling relationship exception [to termination of parental rights] applies where the juvenile court finds that 'substantial interference with a child's sibling relationship' is a 'compelling reason' to conclude that adoption would be detrimental to the child. In making this determination, the court should take into consideration 'the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.' (§ 366.26, subd. (c)(1)(B)(v).)" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1317.) The court must also bear in mind that "'the "sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship." [Citations.]'" (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.) Further, the possible detriment to be considered is not detriment to any sibling, but only the detriment of the child being considered for adoption. (*In re Celine R.* (2003) 31 Cal.4th 45, 54.)

On appeal, we review the juvenile court's factual determination as to whether a significant sibling relationship exists for substantial evidence. That court's decision as to whether termination of that relationship would be detrimental to the child is reviewed for abuse of discretion. (*In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621–622.)

Mother maintains that the juvenile court should have applied the sibling relationship exception to the termination of parental rights because the twins, who were two and one-half years old at the time of the section 366.26 hearing, and had lived with their three siblings for

10

only about 11 months of their lives, "had as good a sibling relationship as was possible under the circumstances," and because it would be "unconscionable for [DCFS] to prevent a sibling relationship from forming by refusing to comply with court orders to facilitate sibling visits." We disagree.

The court noted that although it didn't "doubt that the older children [were] bonded to [the twins]," it was "very difficult . . . to see these younger children are bonded . . . to the older kids," and concluded that the sibling exception did not apply. Substantial evidence supports the juvenile court's determination that no significant sibling relationship existed. Before the petition was filed in mid-February 2012, the 11-month-old twins had lived with their three brothers for only about seven months of their lives. By the end of February 2012, Giovanny was separated from the other three boys because of his aggressive and controlling behavior with his brothers. By early May 2012, the twins had been removed from the first of a series of several foster homes and separated from all three of their brothers because the boys hit and kicked one another and other foster children in the home. The twins have been apart from their siblings ever since. On this record and in light of their young age and the relatively brief period they lived with their brothers, the twins cannot be said to share with their siblings the sort of bond this exception was designed to protect. The record contains no evidence that prior to separation, the relationship between the twins and their brothers was particularly close or strong, or that they shared significant common experiences. Indeed, the scant evidence in the record of the nature of the relationship between the siblings, reflects one largely characterized by aggression, anger and violence. "Since the undisputed evidence did not compel a finding that [the siblings] had a sibling relationship that was beneficial to [the twins], the juvenile court's finding that the sibling relationship exception to adoption did not apply was supported by substantial evidence." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1318, italics omitted.)

Even assuming the evidence was sufficient to establish a significant sibling relationship, mother could not prevail on appeal. The second prong of the exception involves a determination by the court "'that there is a "compelling reason" for concluding termination of parental rights would be "detrimental" to the child due to "substantial

11

interference" with the sibling relationship'" when weighed against the benefit of legal permanence through adoption. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 61; § 366.26, subd. (c)(1)(B)(v).) We bear in mind that "application of this exception will be rare, particularly when the proceedings concern young children whose need for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

Here, the balance between the sibling relationship versus the benefits of adoption tilts strongly in favor of adoption. By the time the section 366.26 hearing, the twins had spent approximately five months in the home of their prospective adoptive parents, a home DCFS characterized as close and loving. The twins were reportedly thriving in the care of foster parents, who were prepared to adopt them and who attended to their physical, emotional, and psychological needs. Failing to terminate parental rights would have deprived the twins of the permanent home their caregivers were prepared to provide. Their immediate need is for stability and permanence. In rare cases, a closely bonded relationship between siblings constitutes sufficient reason to preclude the termination of parental rights of an otherwise adoptable child. This is not the "rare" case in which the sibling relationship exception applies. (*In re Valerie A.*, *supra*, 152 Cal.App.4th at p.1014.)

This case thus bears a marked resemblance to *In re Valerie A.*, *supra*, 152 Cal.App.4th 987. There, toddler twins and their half-sibling, who was six years older, had daily contact before the twins were removed from parental custody. (*Id.* at pp. 994, 1010, 1013.) The siblings subsequently lived together for about seven months, from the time the twins were 17 months to about two years old, before the siblings were separated. (*Id.* at pp. 994, 1010.) The court concluded that "the record clearly shows the children's best interests were served by adoption and the sibling relationship exception did not apply to preclude termination of parental rights. The children . . . were raised in the same home for a relatively short period of time. Although they had contact . . . since birth, the trial court reasonably could infer the experiences the children shared . . . would not be as meaningful to them, as infants and toddlers, as the experiences were to [a child], who was six years older. Even though . . . interactions . . . were loving, affectionate, playful and nurturing, the court

12

reasonably could determine the children's long-term emotional interests, due to their ages and needs, were better served by the permanency of adoption rather than by continued sibling contact." (*Id*. at p. 1013, fn. omitted.)

The record does not reflect that the twins suffered emotional distress from missing their brothers either between their sporadic visits, or that they encountered any difficulty separating from them at the end of the few visits they did have. Moreover, the twins' prospective adoptive parents reported a willingness to facilitate future visits between the siblings. Thus, "termination of parental rights [will] not necessarily foreclose the continuation of the sibling relationships." (*In re Valerie A.*, *supra*, 152 Cal.App.4th at p. 1014.) Here, as in *Valerie A.*, the trial court justifiably was not convinced there would be a disruption in the siblings' relationship. (*Ibid*.)

Finally, we reject mother's assertion that the order terminating parental rights must be reversed because to affirm would permit the "unconscionable" result of allowing DCFS to "prevent a sibling relationship from forming by refusing to comply with court orders to facilitate sibling visits." We turn again to *Valerie A.*, in which the mother argued that because of an improper denial of sibling visitation, she was denied a fair opportunity to litigate the sibling relationship exception to termination of parental rights. The court observed that statutory considerations relevant to determining the nature and extent of the sibling relationship include the disjunctive alternative factors of "whether the child shared significant common experiences with a sibling *or* whether the child has existing bonds with a sibling." (*Valerie A.*, *supra*, 152 Cal.App.4th at p. 1008.) The juvenile court is thus able to consider whether the child shared significant common experiences with his or her siblings in the past and to evaluate the strength of their relationship, before regular visitation became difficult or impossible. In other words, the Legislature recognized that children involved in dependency proceedings often exert little or no control in maintaining sibling relationships. Further, in contrast with the section 366.26(c)(1)(B)(i) "beneficial relationship" exception to termination of parental rights, the juvenile court need not consider whether a child has maintained regular visitation and contact with his or her siblings to determine the applicability of the sibling relationship exception. In sum, while it should certainly not be

13

condoned, even an erroneous denial of sibling visitation, as may have occurred in *Valerie A.* or here, will not compromise a parent's ability to prove the sibling relationship exception. (*Ibid.*)

Under these circumstances, any detriment to the twins from the loss of a legal tie to their siblings was necessarily outweighed by the benefit of being freed for adoption into a loving, permanent home.  We find no abuse of discretion in the juvenile court's determination that the sibling relationship exception of section 366.26, subdivision (c)(1)(B)(v) did not apply.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14