Filed 4/5/16  In re Z.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Z.M., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. D.H., Defendant and Appellant. | F072062 (Super. Ct. No. 14JD0036) **OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from orders of the Superior Court of Kings County.  Jennifer Giuliani, Judge.

Catherine Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Colleen Carlson, County Counsel, and Rise A. Donlan, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Poochigian, J. and Franson, J.

D.H. (mother) appeals from a juvenile court order terminating her parental rights to her four-year-old son Z.M. (Welf. & Inst. Code, § 366.26.)[1] Mother contends the juvenile court erred in not applying the exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i) (hereafter "the beneficial relationship exception"). We affirm.

### PROCEDURAL AND FACTUAL SUMMARY

In April 2014, the Kings County Human Services Agency (agency) responded to a call for assistance from a police officer who reported he was on scene with then two-year-old Z.M., mother, and Z.M.'s father, Robert, who were homeless and walking the streets in extreme heat. The officer also reported that Robert was having a seizure and that emergency medical services were on the way. The officer told the responding social worker that he had provided mother with a place to live, food, clothing, and other resources and that she had refused any help. She continued to panhandle and did not have adequate supplies to care for a young child. The social worker took Z.M. into protective custody and interviewed mother.

Mother stated she had been in the area for approximately two and a half months. She had six children, including Z.M.; two were adults, two were teenagers who lived with their father in Michigan, and the sixth (a 9-year-old) lived with his father in Iowa. She denied abusing drugs, stating, "don't f***kin[g] ask me that shit" and refused to drug test. She said the family lived with her uncle or in a hotel but would not discuss how she provided for Z.M. She also refused to accompany the social worker to the agency to discuss how the social worker might release Z.M. to her custody.

The juvenile court ordered Z.M. detained on a first amended petition, alleging that mother and Robert endangered Z.M. by their willful or negligent failure to provide him adequate clothing and shelter under section 300, subdivision (b) (subdivision (b)

---

[1]     All statutory references are to the Welfare and Institutions Code.

allegations). The court granted the agency discretion to release Z.M. to mother, pending the jurisdictional hearing. Mother moved in with her uncle and the agency released Z.M. to her on April 23, 2014.

On June 17, 2014, the juvenile court convened the contested jurisdictional hearing, which mother had requested. Mother and Robert, however, did not appear. The court found the subdivision (b) allegations true and adjudged Z.M. a dependent. The court also ordered the agency to provide mother and Robert family maintenance services. That same day, a social worker observed mother, Robert, and Z.M. near a freeway exit. Robert was holding a sign that read "FOOD," and mother was holding an umbrella over Z.M. who was sitting in a stroller. When father saw the county vehicle, he put the sign down.

On June 25, 2014, social worker Sonia Cortez met with mother and Robert at their home. She noted that Z.M. appeared healthy and dressed appropriately and that the family had food, diapers, shoes, and clothes for Z.M. Cortez gave mother and Robert a copy of the court report and referrals for drug testing, and parenting and mental health assessments. They became upset and declined the referrals. Robert shouted for Cortez to leave and they threatened to sue the county for harassment and mental anguish and print an article in the local newspaper about how badly the agency had treated them. Mother met with Cortez the next day at the agency office. Mother stated she did not need mental health and substance abuse services. Cortez advised mother of the consequences of not participating in their case plan.

On July 1, 2014, a public health nurse saw mother, Robert, and Z.M. at the same freeway exit panhandling. Robert was holding the "FOOD" sign and the temperature was 104 degrees. Mother denied exposing Z.M. to the heat and panhandling. That same day, the agency filed a supplemental petition (§ 387), alleging family maintenance services had not been effective in protecting Z.M. because mother and Robert refused to

3

participate in services and continued to endanger Z.M. by panhandling with him in extreme weather conditions.

On July 23, 2014, following a contested hearing, the juvenile court sustained the supplemental petition and ordered mother and Robert to complete a parenting program, participate in mental health services and submit to random drug testing as part of a plan to reunify with Z.M.

In December 2014, the department filed its report for the six-month review hearing and recommended the juvenile court terminate mother's and Robert's reunification services because they did not complete any of their services or comply with the drug testing program. Mother tested twice, in July and November of 2014, each time yielding a positive result for methamphetamine and marijuana. Father submitted for drug testing once, in July 2014, and tested positive for methamphetamine and marijuana.

In February 2015, the juvenile court conducted a contested six-month review hearing. Mother testified she visited Z.M. weekly under supervision. She and Z.M. colored, played games, put puzzles together and sometimes watched a movie. Z.M. called her "[M]omma." He was affectionate with her and told her every time, "Z[.M.] done now. I go home." Mother attributed her failure to complete her services to Robert's terminal illness. She explained that he suffered from pseudoseizure disorder and dementia and was HIV positive. She believed it would be inhumane to leave him alone. She also testified that she was HIV positive. At the conclusion of the hearing, the juvenile court terminated reunification services for both parents and set a section 366.26 hearing for June 17, 2015. The court reduced visitation to once a month.

In its report for the section 366.26 hearing, the agency opined that Z.M. was likely to be adopted. He was healthy, developmentally on target, and did not have any significant medical problems. Though Z.M. was adoptable, his foster parents did not want to adopt him, nor did any of his family members. However, the agency was confident that an approved adoptive home could be located for him.

The agency further reported that mother's last documented visit with Z.M. was on March 10, 2015. She brought candy, several books, and a puzzle for Z.M. She and Z.M. colored and looked at books during the visit. They interacted well and both appeared happy during the visit. At the end of the visit, mother kissed Z.M. and cried when he left. The agency scheduled visits for mother and Robert in April and May 2015 but they did not show up.

On July 21, 2015, the juvenile court conducted a contested section 366.26 hearing. Social worker Lupe Montes, Z.M.'s adoption specialist, testified that Z.M. was being transitioned to a new adoptive home. The potential adoptive mother and Z.M. were having unsupervised visits and the agency planned to place Z.M. in the home the following week. The potential adoptive mother's home had been certified and Montes anticipated the placement would be successful. If not, Montes had several other prospective adoptive families to consider.

Montes further testified that mother visited Z.M. in June 2015 and reportedly interacted very appropriately with him. She was very affectionate and loving with him, hugging and kissing him, and played games with him. Montes believed they shared a parent/child bond and that he viewed her as his parent. However, she did not believe that severing that bond would be harmful to Z.M. because he had been out of mother's custody for over a year and was bonded to his caretakers whom he referred to as "[M]om" and "[D]ad." Montes also cited Z.M.'s young age and need for permanency and stability, which she believed he would receive through adoption.

Mother testified Z.M. was happy to see her when they visited. He called her "[M]omma" or "[M]omm[y]," and told her that he loved her and asked when he could come home. Mother objected to Z.M. being adopted because it would harm him and his siblings, who lived in Michigan and Nebraska. They had not seen Z.M. for approximately a year and a half.

At the conclusion of the hearing, the juvenile court found Z.M. to be adoptable. The court also recognized that mother and Robert had a parental bond with him. However, the court could not find that Z.M.'s bond to them was so strong that terminating their parental rights would be harmful to him. Instead, the court found that the permanency and stability he would receive in an adoptive home outweighed the need to preserve the parental bond. Thus, the court terminated mother's and Robert's parental rights.

This appeal ensued.

**DISCUSSION**

Mother contends she established the existence of the beneficial relationship exception and therefore the juvenile court erred by terminating her parental rights. She argues the juvenile court should have ordered legal guardianship. We disagree.

Section 366.26 governs the proceedings at which the juvenile court must select a permanent placement for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the court determines it is likely the child will be adopted, the statute mandates termination of parental rights unless the parent opposing termination can demonstrate that one of the statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B).)

Mother contends the exception found in section 366.26, subdivision (c)(1)(B)(i), i.e. the beneficial relationship exception, applied in her case. The beneficial relationship exception pertains where the evidence supports "a compelling reason for determining that termination would be detrimental to the child [because the parent maintained] regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "'To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination.' [Citation.] A beneficial relationship 'is one that "promotes the well-being of the child to such a degree

6

as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.""" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

The nature of the relationship between the parent and child is key in determining the existence of a beneficial relationship; it is not sufficient to show that the child derives some benefit from the relationship or shares some "'emotional bond'" with the parent. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).) "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) In other words, the parent must show he or she occupies a "'parental role' in the child's life." (*K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

The parent has the burden of proving the statutory exception applies. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.) The court's decision that a parent has not satisfied this burden may be based on either or both of two component determinations— whether a beneficial parental relationship exists and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) When the juvenile court concludes the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion. (*K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622.)

Here, the juvenile court found that mother satisfied her burden of showing that a beneficial relationship existed, noting that there was a parental bond. The court did not, however, find that terminating mother's parental rights would be detrimental to Z.M.

Thus, in order to prevail on her appeal, mother would have to show that the juvenile court abused its discretion in terminating her parental rights.

Mother did not present the juvenile court with *any* evidence that severing her parental rights would be detrimental to Z.M. She did not, for example, offer a bonding study or other evidence showing that termination of parental rights would have a significant detrimental effect on Z.M. Additionally, Montes opined that terminating mother's parental rights would not be detrimental to Z.M. given the length of time he had been separated from her and the bond he also shared with his caretakers.

On appeal, mother contends the juvenile court abused its discretion in terminating her parental rights essentially because it did not apply the beneficial relationship exception.[2] As we stated above, the juvenile court found that the exception applied to the extent that mother established the existence of a beneficial relationship. The court did not, however, find that she met her burden of proving that the preservation of that relationship outweighed the benefit to Z.M. of being adopted. In other words, the juvenile court determined that it would not be detrimental to Z.M. to be adopted notwithstanding the existence of a beneficial relationship with mother and mother has failed to show that the juvenile court's determination was an abuse of discretion.

We find no error and affirm the juvenile court's order terminating mother's parental rights.

## DISPOSITION

The July 21, 2015 order terminating mother's parental rights is affirmed.

---

**2** Specifically, she contends the juvenile court erred because "there is insufficient evidence to support the lower court's determination that the exception to adoption preference did not apply."

8