Filed 9/3/14  In re Ryan G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Ryan G., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Sarah S., <br><br> Defendant and Appellant. | A139980 <br><br> (Alameda County Super. Ct. No. OJ12018424) |

Sarah S. (mother) appeals from an order terminating her parental rights to her son Ryan G. and declaring adoption to be the permanent plan.  (Welf. & Inst. Code, § 366.26.)[1]  Mother argues the order should be reversed because the beneficial parental relationship and sibling relationship exceptions to adoption apply.  (§ 366.26, subd. (c)(1)(B)(i) & (v).)  We affirm.

## I.  BACKGROUND

In February 2012, mother lived with her four children:  four-month-old Ryan, his two-year-old sister, Kaitlyn, and their two older half-siblings.  Mother had a history of substance abuse and domestic violence issues, and was receiving family maintenance services for her two older children, who had been declared dependents of the juvenile court.

---

[1] Further statutory references are to the Welfare and Institutions Code.

1

Respondent Alameda County Social Services Agency (Agency) filed a dependency petition alleging Ryan and Kaitlyn came within jurisdiction of the juvenile court under section 300, subdivisions (b) and (j), based on an incident of domestic violence between mother and Ryan and Kaitlyn's father,[2] mother's alcohol use, and her failure to obtain treatment for substance abuse as required by the family maintenance plan in the older children's dependency case. The petition was amended to add allegations mother had slapped the older children's father while waiting in the courthouse hallway and had become intoxicated from drinking beer while waiting for a court hearing.

All four children were removed from mother's custody on February 22, 2012, when she was arrested for slapping the older children's father. The oldest two children were placed with their father with family maintenance services, where they have remained. Ryan and Kaitlyn were initially placed with their maternal grandparents, but Ryan was moved to a nonrelative foster home on March 6, 2012, after the grandmother indicated she could no longer care for him.

On March 28, 2012, mother waived her right to a contested hearing and the court sustained the dependency petition filed as to Ryan and Kaitlyn. Mother had previously told an Agency social worker that while she loved her children, she did not want to engage in reunification services with Ryan and Kaitlyn. Notwithstanding this statement, the court approved a reunification plan for mother that included components of visitation, domestic violence prevention, anger management, and substance abuse testing and treatment.

During the reunification period, mother, who was pregnant, had weekly, two-hour visits with Ryan, with the first hour supervised by a social worker and the second hour consisting of a therapeutic visit with a SEED (Services to Enhance Early Development) clinician. Mother was attentive to Ryan during the visits, encouraging him to explore the toys in the room, redirecting him when necessary, and giving him lots of affection and

_____

[2] Ryan's father is not a party to this appeal.

2

smiles. However, mother did not comply with the domestic violence and substance abuse treatment requirements of her reunification plan, and was in jeopardy of losing her subsidized housing due in part to allegations of a " 'partying constantly . . . pregnant woman smoking and drinking on the front porch all day.' "

The SEED clinician who supervised the therapeutic aspect of the visits between mother and Ryan reported that mother was consistent in her participation and "demonstrates a strong knowledge of infant/child development." Ryan was showing "a developmentally appropriate preference for his primary care provider" (the foster mother) and had developed a strong relationship with his foster parents, but was comforted by mother so long as the foster mother was not in the room. Mother and Ryan had a "palpable connection," even though they were limited to seeing each other once a week.

At the six-month status review hearing held September 13, 2012, Agency argued it would be detrimental to return Ryan and Kaitlyn to mother's care due to her lack of compliance with the reunification plan. The court terminated reunification services and set the case for a hearing under section 366.26. Kaitlyn was later placed in a legal guardianship with her grandmother.

Mother gave birth to a son (Ryan's younger brother) in December 2012, who has remained in her care. Her visits with Ryan continued and she would often bring the new baby. Supervised visits were conducted at The Gathering Place in Pleasanton, at which mother appeared "attentive and engaged." In February 2013, mother suggested she might take Ryan from the foster parents if the court did not return him to her, and the visits were moved to a more secure facility. Mother began missing some visits and was late to others. She was still described as "attentive and engaged" with Ryan, but her energy and mood vacillated and "it was unclear if the mother was stressed at times, under the influence of drugs/alcohol, or dealing with mental health issues."

Ryan's foster parents arranged visits between Ryan and his older siblings, at a frequency of about once a month.

The report and addenda prepared by Agency for the section 366.26 hearing recommended a permanent plan of adoption for Ryan. The reports noted Ryan appeared

3

"calm and comfortable in the care of" his foster parents, who were committed to adopting him. "Ryan is a healthy child who is meeting developmental milestones appropriate for his age. He has not had any contact with his father for over a year. He has had on-going contact with his mother but this contact has not been of a sufficient frequency and duration to maintain or further a strong parent-child relationship. For the past 5 months the mother attended half of the 20 opportunities she had to visit with Ryan. He has been out of her care for 19 months, which is over 80% of his life. While Ryan has on-going contact with his siblings he has not lived with them for the past year. Ryan is placed with foster parents who would like to adopt him if he is freed for adoption." The foster parents were "committed to maintaining Ryan's relationship with Kaitlyn, who is being raised by the maternal grandparents, and his [half-]siblings . . . , who [are] being raised by their father. They try to plan monthly, or every other month visits. The foster parents are considering on-going contact between Ryan and his mother and [younger] brother at occasional family functions."

Mother filed a trial brief asserting the termination of parental rights would be detrimental to Ryan due to her beneficial parental relationship with him. She also argued a termination of her parental rights would be detrimental because it would substantially interfere with Ryan's relationship with his younger brother.

The court held a contested section 366.26 hearing, at which mother testified. She described her visits with Ryan as "good," though they "can't stand" the facility in which they were held. During the visits they would have a snack, go to the potty, color, and play basketball. Ryan did not have a name for mother, but knew she was "his mom." She thought they had a good relationship and he didn't want to leave her when the visits came to an end. Ryan helped her prepare bottles for his little brother and liked to push him around in a cart. Mother believed Ryan would be "lost" if he never saw his younger brother again, "wondering who his parents are."

The trial court terminated mother's parental rights and declared adoption to be the permanent plan. It ruled mother had not established a beneficial parental relationship that would defeat adoption: "[Ryan] has been out of her care for at least 80 percent of his life.

4

And even though there have been visits, the visits have not been of the quality that—and the frequency that the Court believes that it would take to establish a parental relationship with this child. [¶] And the Court believes that she's not satisfied the burden of establishing that there is a beneficial relationship." As to the sibling relationship between Ryan and his younger brother, "[Ryan] was not raised with [his younger brother]. They've not shared any significant experiences or common experiences, and there's not really been any ongoing contact between the two siblings. And the court cannot find that it's in [Ryan's] long-term, emotional interest to justify a finding that there is a sibling relationship, and that exception applies in this case."

## II. DISCUSSION

Mother argues the juvenile court should have selected something less drastic than adoption as the permanent plan, citing the beneficial parental relationship exception of section 366.26, subdivision (c)(1)(B)(i) and the sibling relationship exception of section 366.26, subdivision (c)(1)(B)(v). We disagree.

### A. *Exceptions to Adoption and Standard of Review*

At a hearing under section 366.26, the court may order one of three alternative plans: adoption (necessitating the termination of parental rights), guardianship or long-term foster care. (§ 366.26, subd. (b)(1), (3), (5), (6).) If the child is adoptable, there is a strong preference for adoption over the other alternatives. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)

Once the court determines the child is adoptable, a parent seeking a less restrictive plan has the burden of showing a "compelling reason" the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B). (*In re S.B., supra*, 164 Cal.App.4th at p. 297; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Section 366.26, subdivision (c)(1)(B)(i) provides for one such exception when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Another exception is set forth in section 366.26, subdivision (c)(1)(B)(v), which applies when, "[t]here would be substantial interference with a child's sibling relationship."

5

Case law has been divided as to the correct standard for appellate review of an order determining the applicability of these exceptions, with some courts applying a substantial evidence test, some an abuse of discretion analysis, and some a combination of both.  (E.g., *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351; *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)  We conclude both standards are relevant.

Whether a parent or sibling has a beneficial relationship with the child is a factual issue to which the substantial evidence standard applies.  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)  Because the parent or other proponent had the burden of proving the exceptions to adoption, the precise question for a reviewing court on a parent's appeal from an order rejecting an exception is "whether the evidence compels a finding in favor of the appellant as a matter of law."  (*Id*. at p. 1314; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

As to whether the existence of a bond between the parents or siblings is so strong that the child would suffer detriment from its termination, that decision is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit . . . of adoption.' [Citation.]"  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)  We review this aspect of the trial court's order for abuse of discretion.  (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

B.  *Beneficial Relationship Exception*

We turn first to mother's argument she carried her burden of establishing the beneficial parental relationship exception, which requires the juvenile court to balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for

6

adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The beneficial relationship exception is difficult to establish "in the situation, such as the one here, where the parents have [not] . . . advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) It is not enough to show that the parent and child have a friendly and loving relationship. (See *In re Brian R.* (1991) 2 Cal.App.4th 904, 924; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)

The trial court concluded mother's relationship with Ryan was not parental in nature, which is another way of saying the bond was not sufficiently strong to render a termination of rights detrimental to Ryan. This was not an abuse of discretion. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.) Mother's contacts with Ryan, while loving and positive, consisted exclusively of two-hour weekly supervised visitation for more than 80 percent of his life. After the visits were moved to another facility for security reasons, mother missed about half of them. "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854.)

C. *Sibling Contact Exception*

The sibling contact exception applies when the termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "In enacting this exception, the legislature was concerned with preserving long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (See *In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)

The juvenile court quite reasonably concluded Ryan's limited relationship with his infant brother did not outweigh the benefits of a stable adoptive home. Ryan and his younger brother were very young, never shared a home, and lacked any common experiences other than the supervised visits that both attended. The case is similar to *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293, in which the court found the sibling exception inapplicable to a child who had been removed from her mother's custody when she was only one and one-half-years-old and had been visiting her half-siblings between two and four times a month. "[A]lthough the [child] clearly enjoyed the time she spent with her half-siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded." (*Ibid.*) So too here.

Mother argues the court should have also considered the relationship between Ryan and his three older siblings, with whom he had lived for the first four months of his life until they were all removed from her custody. This contention has been forfeited by mother's failure to raise the relevant exception below. (*In re Erik P.*, *supra*, 104 Cal.App.4th at p. 403.)

Nor are we persuaded by mother's alternative claim her trial counsel was ineffective in failing to extend the argument about the sibling relationship exception to the three older siblings. To successfully claim ineffective assistance of counsel, mother must show: (1) counsel's representation fell below prevailing professional norms; and, (2) absent counsel's alleged failings, a more favorable result was reasonably probable. (*In re Daisy D.*, *supra*, 144 Cal.App.4th at pp. 292-293.) Mother has satisfied neither of these prongs, as she cannot show the sibling relationship exception would apply to Ryan's relationship with his three older siblings, even if the issue had been raised by counsel.

Ryan's three older siblings were placed with relatives outside mother's home, and the foster parents were committed to working with those caregivers to maintain contact between the siblings. (See *In re Megan S.* (2003) 104 Cal.App.4th 247, 254 [proper to consider prospective adoptive family's willingness to allow sibling contact].) There is no

8

reason to think the termination of mother's parental rights to Ryan would interfere with his relationship with his older siblings who are in the custody of people with a history of cooperation.

Even if we assume Ryan would have no further contact with his older siblings upon his adoption, the record does not support a finding of detriment. Ryan was very young (four months old) when he last lived with these siblings and had only visited with them on a monthly basis since their removal from mother's home. It is not reasonably probable a court faced with the question would have determined the quality of his relationship with them was sufficiently strong to defeat the statutory preference for adoption. (*In re Daisy D.*, *supra*, 144 Cal.App.4th at pp. 292-293.)

Mother argues this case is similar to *In re Naomi P.* (2005) 132 Cal.App.4th 808, 811-812, 824 (*Naomi P.*), which recognized the sibling relationship exception in a case where the child had been removed from her mother's custody shortly after birth and had never lived in the home with her much-older siblings. The facts of that case are distinguishable.

The child in *Naomi P.* was placed in a legal guardianship with a relative, and had weekly visits with her siblings in her grandmother's home, where her siblings lived, sometimes spending the whole weekend with them. (*Naomi P.*, *supra*, 132 Cal.App.4th at pp. 812, 820.) That guardianship was terminated when the relative guardian was alleged to have neglected her own children. (*Id.* at p. 813.) After the child was moved to the home of a family friend who wanted to adopt her, frequent visits with her siblings and grandmother continued with some of those visits lasting several hours to the entire day. (*Id.* at pp. 818-819.) At the section 366.26 hearing, the juvenile court found the sibling relationship exception applied and ordered a permanent plan of legal guardianship, based on the strength and importance of the children's relationship with each other and the court's concerns about the foster mother's willingness to maintain that contact. (*Id.* at p. 821.) The court of appeal, applying a substantial evidence standard, rejected a contention by the social services agency that the juvenile court should have terminated parental rights. (*Id.* at p. 824.)

9

In *Naomi P.,* the child's transition from a relative guardianship to a new home following allegations of neglect against the guardian made it reasonable for the juvenile court to view the child's relationship with her siblings as the sort of "anchor" the legislature was trying to protect when it enacted the sibling relationship exception. (*In re Erik P.*, *supra*, 104 Cal.App.4th at p. 404.) The child in *Naomi P.* had spent many more hours with her siblings, over a longer period of time, than Ryan has in this case. But even more significantly for our purposes, the order under review in *Naomi P.* was that the sibling exception *applied.* (*Naomi P.*, *supra*, 132 Cal.App.4th at p. 824.) That order was entitled to deference, and could only be reversed on appeal if the juvenile court abused its discretion or made a factual finding unsupported by substantial evidence. (See *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) To say the juvenile court's order was properly affirmed based on a substantial evidence standard is not to say the juvenile court in *Naomi P.* would have erred in reaching a different conclusion under the same facts. *Naomi P.* does not provide support for mother's claim the sibling exception compels reversal in the case before us.

## III.  DISPOSITION

The judgment (order terminating parental rights under section 366.26) is affirmed.

_____
NEEDHAM, J.

We concur.

_____
SIMONS, Acting P.J.

_____
BRUINIERS, J.